STATE of Missouri, Plaintiff–
Respondent,

v.

Jackie D. BLAKEY, Defendant–
Appellant.

No. 27335.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 30, 2006.

Ellen H. Flottman, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Linda Lemke, Asst. Atty. Gen., Jefferson City, for respondent.

PHILLIP R. GARRISON, Judge.

Following a bench trial, Jackie D. Blakey ("Defendant") was convicted of second degree murder, a violation of Section 565.021,[1] abuse of a child, a violation of Section 568.060, and two counts of endangering the welfare of a child in the first degree, violations of Section 568.045. Defendant appeals his convictions, contending that the trial court erred in permitting testimony regarding Defendant's prior acts of violence, and in allowing a State's witness to testify as an expert. We affirm.

Defendant does not challenge the sufficiency of the evidence supporting his convictions. In the light most favorable to the verdict, the record reveals the following.

---

**1.** All references to statutes are to RSMo (2000) unless otherwise indicated.

In April 2004, two-year-old T.S. ("Victim"), who had been living with his father, began living with his mother, Amy Skiles, ("Skiles") and her boyfriend, Defendant, in Lampe, Missouri. Initially, Skiles' sister took care of Victim while Skiles and Defendant were working. However, in May 2004, Defendant became unemployed and took on the responsibility of watching Victim while Skiles was at either of her two jobs.

After Skiles got off of work the morning of May 6, 2004, she took Victim to a garage sale, and then swimming, before going to her job as a waitress. Later that evening, Defendant brought Victim to see Skiles at work, and they had something to eat. While there, Victim was in good spirits, playing and running around, but when Skiles returned home from work that evening, Victim would not leave her presence, which she thought was unusual.

Skiles went to work the next morning, but returned in the afternoon and took Victim to a church garage sale, and then to the grocery store. As they were leaving the grocery store, Victim complained that his "private" area was hurting. When Skiles returned home she checked Victim's genitals and observed that the area was red, but she did not notice any other bruising on his body. Defendant told Skiles that the area was red because Victim was wetting his pants.

As Skiles was leaving for work that evening, Victim began "screaming and bawling." This was behavior that she had never observed and she thought it was unusual, but she left Victim with Defendant.

When Skiles returned home from work that night, she noticed a "Bengay" type smell. Defendant met her at the front door and said that he had already put Victim to bed because he was feeling sick, explaining that the dog had knocked Victim down the hill in the backyard. Skiles looked into Victim's room and saw that he was in his bed wrapped in a sheet. Thinking that nothing was wrong she took a shower and then watched television. Later, she heard Victim whimpering, but Defendant said he was fine.

Skiles fell asleep on the couch, but she was awakened around 4:30 a.m. the next morning when Defendant yelled for her to come into the bedroom. When she did, she saw Victim lying naked near the end of the bed, with a towel and ice cubes placed on his chest. Defendant said that Victim had stopped breathing, and he had placed him under cold water to revive him. Skiles told Defendant that they needed to take Victim to the hospital, but Defendant said they could not do that, and removed the towel covering Victim's body, revealing bruising on Victim's abdomen. Defendant said Victim received the bruises when the dog had knocked him down the hill, but they could not take him to the hospital, because they would be suspected of child abuse. He explained that Victim had not been feeling well that night and he had not eaten supper. Defendant said that Victim was naked because it hurt whenever he put clothes on him.

When Skiles reached for Victim, Defendant raised his fist to her, and said "[she] wasn't taking [her] son to the hospital." Skiles, who felt threatened, did not take Victim to the hospital, instead she fed him a popsicle which he threw up ten minutes later.

Skiles checked in on Victim the next morning, and then left for work. Later that morning, Skiles' next door neighbor, Hayden Bridges ("Hayden"), ran into his house and told his older sister, Kelsey Bridges ("Kelsey"), to call 911 because Victim was not breathing. Kelsey called 911 and ran next door taking the phone with

her. When she arrived at Skiles' trailer she saw Defendant leaning over Victim, who was blue and lying naked in front of the door. Hayden and Kelsey took turns speaking to the 911 operator and relaying instructions to Defendant as he administered CPR.

Paramedic Robert Staab ("Staab") received a dispatch informing him that a two-year-old had drowned in the bathtub. He arrived with the ambulance at 11:06 a.m., finding Victim pale and lifeless. Upon observing bruising on Victim's chest, abdomen and legs, Staab believed that he was dealing with an abuse situation. As he was trying to get Victim to start breathing, Staab asked Defendant if Victim had been in the tub, and Defendant said that Victim had gone to get something to drink and then "layed [sic] down, and stopped breathing." Staab and his partner started CPR and compression. Staab, who hooked Victim up to a heart monitor and determined that Victim's heart had not been beating for up to ten minutes, administered drugs to Victim and was able to get his heart to start beating again. Victim was then transported by helicopter to St. John's Hospital ("Hospital") in Springfield.

Sergeant Tony Stephens ("Sergeant Stephens") of the Stone County Sheriff's Department was dispatched to Defendant and Skiles' home in reference to a possible child drowning. After arriving at 11:18 a.m., Sergeant Stephens asked Defendant what had happened, and was told that Victim had laid down, turned a "funny color" and then stopped breathing. Defendant told Sergeant Stephens that he ran cold water over him in the bathroom in an attempt to revive him. When Staab pointed out the bruising on Victim's body to Sergeant Stephens, Defendant volunteered that the dog had knocked Victim down in the backyard the day before. Sergeant Stephens observed vomit in the bathroom, on a pair of blue jeans and in the front room where Victim was being attended to. He noted that Defendant appeared extremely nervous.

After arriving at the Hospital, Victim was seen by Dr. Christopher Edwards ("Dr. Edwards") after a CAT scan was performed. When Dr. Edwards reviewed Victim's CAT scan, he noticed free air and fluids outside of the intestine, which indicated a perforation in the intestine. He also observed "a tremendous amount of bruising across ... his abdominal cavity externally, all the way from the rib cage down to the pelvic bones[,]" as well as bruises on both arms, a "bluing coloration of his skin ... that ... comes from lack of blood flow and lack of oxygenation to the skin[,]" and swelling in the genital area. It was clear to Dr. Edwards that Victim needed immediate surgery if he were to live.

When Victim was taken to surgery, his heart and lungs stopped working, and Dr. Edwards had to administer life-saving drugs. He then opened the chest cavity and performed a cardiac massage to circulate Victim's blood to his body and to his brain. Once Victim's blood began circulating again, Dr. Edwards opened up Victim's abdomen to further assess his injuries. He discovered that a tremendous amount of free air and intestinal contents had leaked into the cavity itself. After cleaning out the fluids, he noticed that a portion of the small intestine had been split in half. Victim died in surgery as Dr. Edwards was attempting to repair the severed portion of the small intestine.

Dr. Paul Robert Spence ("Dr. Spence"), the medical examiner for Greene County, performed Victim's autopsy. Dr. Spence observed Victim's body externally, noticing bruises on his arms and hands and a large area of discoloration over the abdomen.

He also observed swelling and discoloration to Victim's genitals consistent with blunt force trauma. While performing the autopsy, Dr. Spence discovered a "complete transection" of the portion of the small intestine coming off of the stomach. Dr. Spence determined that Victim died from inflammation of the abdomen and blood infection due to rupture of the small bowel from blunt force injury to the abdomen.

Defendant was charged by amended information with murder in the second degree, child abuse, and two counts of endangering the welfare of a child. Defendant waived his right to a jury trial and was tried by the court. At trial, both Dr. Spence and Dr. Edwards testified that Victim's injuries were not consistent with a fall down a hill, but were the type of injuries seen in a high-speed car accident or a fall from a two-story building. Dr. Spence testified that in order for Victim to receive his injuries from falling down a hill, he would have had to fall down a steep hill, approaching a speed of thirty-five miles per hour, and landing on something substantial like a rock. Both doctors agreed that Victim's injuries would have caused him extreme pain, nausea, vomiting, fever, and rigidity to the abdomen. They concluded that Victim's injuries were caused by blunt force trauma to the abdomen, resulting in abdominal swelling and blood infection, culminating in Victim's death.

The trial court found Defendant guilty on all four counts and sentenced him to twenty-five years for second degree murder, ten years for abuse of a child, and four years for each count of endangering the welfare of a child, with sentences in Counts I and II to run consecutively and Counts III and IV to run concurrently with each other and with Counts I and II. This appeal followed.

In his first point, Defendant argues that the trial court abused its discretion in allowing Skiles to testify about prior acts of violence committed against her by Defendant. Defendant maintains that such evidence was inadmissible character and propensity evidence, and that he was prejudiced by its admission. We disagree.

The trial court is vested with broad discretion in determining the admissibility of evidence, and we will not disturb its ruling absent a clear abuse of that discretion. *State v. Naasz,* 142 S.W.3d 869, 878 (Mo.App. S.D.2004). A trial court abuses its discretion where its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.*

A criminal defendant has the right to be tried only for the offense for which he is charged. *State v. Pennington,* 24 S.W.3d 185, 189 (Mo.App. W.D.2000). Therefore, evidence of uncharged crimes or prior misconduct is inadmissible if offered for the purpose of showing a defendant's propensity to commit the crime with which he is charged. *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993).

However, evidence of uncharged crimes or prior misconduct, "although not admissible to show propensity, is admissible if [it] is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial." *Id.* In addition, the evidence must be legally relevant; that is, its probative value must outweigh its prejudicial effect. *Id.*

Generally, evidence of other uncharged crimes or prior misconduct is logically relevant when it tends to estab-

lish: (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan, or (5) the identity of the person charged. *State v. Beal*, 966 S.W.2d 9, 13 (Mo.App. W.D.1997). "An additional exception is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged. This evidence is admissible to present a complete and coherent picture of the events that transpired." *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994)(internal citations omitted).

■ Evidence of prior misconduct that does not fit any of the articulated exceptions may still be admissible if it is logically and legally relevant. *Bernard*, 849 S.W.2d at 13; *see also State v. Sladek*, 835 S.W.2d 308, 312 (Mo. banc 1992) (explaining that "[E]vidence of the commission of an uncharged crime may prove motive or intent or another material fact, but in any event the evidence must have some legitimate tendency to directly establish the defendant's guilt.").

In the present case, Skiles testified that she did not take Victim to the hospital because she felt threatened when Defendant raised his fist towards her. To explain why this action would prevent her from seeking treatment for Victim, the State elicited testimony that in the weeks preceding Victim's death, Defendant had body-slammed, bit, and slapped Skiles.

At trial, Defendant did not object to the admission of evidence that he raised his fist to Skiles and does not challenge its admissibility on appeal. Defendant contests the admission of evidence that he had, on other occasions, body-slammed, bit, and slapped Skiles. He maintains that "this evidence was inadmissible character and propensity evidence and was particularly prejudicial where whether [Defendant] committed this act of violence at all

was the ultimate issue in the case." Defendant relies on *State v. Wallace*, 943 S.W.2d 721 (Mo.App. W.D.1997), and *State v. Milligan*, 654 S.W.2d 204 (Mo.App. W.D.1983), to support his argument, however, those cases are distinguishable.

In *Wallace*, the defendant was charged and convicted of first degree assault. *Id.* at 723. On appeal, he challenged the admissibility of prior acts of abuse committed by him towards the victim. *Id.* at 723–24. The Court explained:

> The prior acts of abuse presented by the State tend to show [the defendant] has intended harm to [victim] in the past, which might be logically relevant to discredit any assertion by [the defendant] of accident or self-defense. However, [the defendant] never claimed accident or self-defense. He never denied attacking [victim]. Evidence of bad acts or uncharged crimes is only admissible "if it is highly relevant to a legitimate issue in the case."

*Id.* at 724 (quoting *State v. Douglas*, 917 S.W.2d 628, 630 (Mo.App. W.D.1996)). The State argued in *Wallace* that the evidence was logically relevant in that it showed that the defendant intended "serious physical injury," a necessary element of first degree assault. *Id.* The Court disagreed, explaining that "[w]here ... the State presents direct evidence that the defendant committed the act charged, the proof of the act ordinarily gives rise to an inference of the required *mens rea.*" *Id.* at 725. In ruling that the evidence was not legally relevant, it stated that "unless and until the defendant challenges the intent element, the prosecutor's need to introduce evidence of prior bad acts is minimal, while the prejudicial effect of admitting the evidence is substantial." *Id.* at 725.

In *Milligan,* the Court reversed the defendant's conviction of second degree murder where the State presented evidence at trial that "when drinking [the defendant] was mouthy, pushy, and wanting to fight everyone." 654 S.W.2d at 208–09. The Court explained that the State was trying to show the jury that the defendant "was known to drink and that his reputation when drinking was of violent and mean conduct. The theory apparently was to convince the jury that because the crime here was one of a violent nature then [the defendant] was thereby guilty." *Id.* at 209.

*Wallace* and *Milligan* are inapposite to the case at bar, in that the State did not offer evidence of Defendant's prior misconduct to prove intent or to show a reputation for violence, but to explain why Victim was not taken to the hospital when his injuries were first discovered by Skiles. While Defendant offers no explanation for why the evidence is inadmissible for that purpose, the State maintains that such evidence is admissible under the exception allowing evidence to paint a complete picture of the offense charged.

In *Pennington,* a case cited by neither party to this appeal, the western district of this Court discussed the admission of prior misconduct in order to provide a complete picture of the offense charged. 24 S.W.3d 185. In that case, the defendant was being tried for stealing cases of soda from a display near the gas pumps at a convenience store. *Id.* at 187. The prosecution presented evidence that an assistant manager of the store had seen the defendant perpetrate the same crime twice before. *Id.* This evidence was introduced to explain why the assistant manager pulled his vehicle behind the defendant's vehicle in an attempt to prevent him from leaving in violation of company policy not to confront shoplifters. *Id.* at 190. The Court held that the testimony regarding the defendant's prior uncharged crimes of stealing beverages from the convenience store was inadmissible because: (1) it lacked a legitimate tendency to directly establish the defendant's guilt of the charged offense; (2) its probative value did not outweigh its prejudicial effect; and (3) "there was no strict necessity for the admission of the other crimes evidence." *Id.* at 190.

The State contended in *Pennington,* as it does here, that the "evidence of [the defendant's] other uncharged crimes fits under the exception allowing the admission of such evidence to establish a complete and coherent picture of the circumstances surrounding the offense." *Id.* In rejecting the State's argument in *Pennington,* the Court explained that, "[a]lthough [the defendant's] past acts of misconduct may have helped to provide a 'complete and coherent picture' of [the store manager's] actions, the evidence is not admissible under this exception for two reasons[:]" (1) the crimes "were not part of the circumstances of the offense charged or part of the sequence of events surrounding the offense charged[;]" and (2) "no authority cited by the [S]tate or found by this court has ever held that evidence of other crimes is admissible to explain the motive of a *witness* in the course of the offense charged." *Id.* at 191 (emphasis in original). The Court explained that "[i]n determining whether such evidence is admissible, the analysis focuses on the identity, motive, et cetera of the defendant, not of a witness or any other individual." *Id.* Ultimately, the Court determined that the defendant's past misconduct was not logically relevant because it "fail[ed] to fit into any exceptions cited by the [S]tate[,]" and "[i]t lack[ed] a legitimate tendency to directly establish [the defendant's] guilt of the charged offense[.]" *Id.*

Based on *Pennington,* Defendant's physical abuse of Skiles would not appear to fall under the exception allowing evidence of prior misconduct to "present a complete and coherent picture of the events that transpired[,]" *Harris,* 870 S.W.2d at 810, because this misconduct was "not part of the circumstances of the offense charged or part of the sequence of events surrounding the offense charged[.]" *Pennington,* 24 S.W.3d at 191.

Somewhat to the contrary of *Pennington* is *State v. Coutee,* 879 S.W.2d 762 (Mo.App. S.D.1994), where the Court ruled that prior misconduct of the defendant was admissible, in part, to explain why a witness waited to call the police when she had suspected that the defendant had done something criminal. In *Coutee,* the defendant was convicted of second degree murder for a fatal shooting resulting from someone firing thirteen shots into a crowd of people. *Id.* at 764, 768. Hours before the shooting, the defendant took a rifle from a neighbor as she was standing in her front yard and ran off with it. *Id.* at 765. After the shooting had occurred, the defendant returned the rifle to the neighbor, but then came back and took the barrel of the rifle which he intended to "bore out." *Id.* The neighbor feared for her family's safety, so she did not immediately report the incident to the police. *Id.* at 765, 768.

On appeal, the defendant in *Coutee* alleged, *inter alia,* that the trial court should have excluded certain trial testimony, including the neighbor's testimony that, among other things, her relationship with the defendant was tense and the defendant repeatedly threatened her. *Id.* at 767. Although the neighbor's testimony involved evidence of the defendant's prior misconduct, the Court found that it fell within the *res gestae* exception, because it "help[ed] explain where the murder weapon came from, why [the neighbor] had that weapon in the first place, how [the defendant] got it from her, and *why she waited to contact the police until after she had moved her children and made sure they were safe." Id.* at 768 (emphasis supplied).

■ Like *Coutee* and *Pennington,* Defendant's prior misconduct in the present case was offered to explain why a particular witness acted as she did. While this is an impermissible purpose under *Pennington,* the Court's discussion in *Coutee* implicitly sanctions the introduction of a defendant's prior misconduct to explain the behavior of a witness. However, even if Defendant's prior misconduct is inadmissible under *Pennington,* we find that he was not prejudiced by its admission and, therefore, reversal in this case is not required.

■ "To warrant reversal, improperly admitted evidence must have resulted in prejudice to the defendant." *State v. Collins,* 962 S.W.2d 421, 424 (Mo.App. W.D. 1998). We will reverse only where the improper admission of evidence was so prejudicial that it deprived the defendant of a fair trial. *State v. Berwald,* 186 S.W.3d 349, 361 (Mo.App. W.D.2005). "In criminal cases involving the improper admission of evidence, the test for prejudice 'is whether the improper admission was outcome-determinative.'" *Id.* at 362 (quoting *State v. Black,* 50 S.W.3d 778, 786 (Mo. banc 2001)). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." *Black,* 50 S.W.3d at 786.

In assessing prejudice, the Court in *Pennington,* noted that "[t]his was not a case where the evidence of uncharged crimes was casual or vague. The prosecu-

tion made numerous references to these events during testimony and again in closing argument." 24 S.W.3d at 191. The Court went on to state that "[g]iven the fact that the principal evidence of [the defendant's] guilt of first-degree robbery and armed criminal action came from [the assistant manager's] testimony, as well as the inherent prejudice from such evidence, we do not believe that the error was harmless." *Id.* The Court found that "[t]he trial court's error prejudiced [the defendant] to the degree that he was deprived of his right to a fair trial," and, therefore, the Court reversed and remanded the case for a new trial. *Id.*

■■■ Here, the State only made limited reference to Defendant's prior misconduct. In determining the existence of reversible error, "[t]he amount of evidence that was erroneously admitted and the extent to which the evidence was referred during the trial is another consideration." *State v. Barriner,* 34 S.W.3d 139, 151 (Mo. banc 2000). In this regard, the record shows that the evidence in question was isolated and the State did not unduly highlight Defendant's prior misconduct.

■■■ In assessing prejudice, it is also important to note that this case was not tried before a jury. The Missouri Supreme Court has stated that:

> In a jury-waived case a certain amount of latitude in the admission of evidence is allowed, and even where an error is made in the admission of some evidence, except where the trial court relied on that evidence in arriving at its findings of fact and conclusions of law, such error is ordinarily held to be non-prejudicial. This is so because the rules of exclusion in the law of evidence as applied in a court of law are largely as a result of the jury system and serve the purpose of keeping from the jury all irrelevant and collateral matters which might tend to

confuse them or mislead them from a consideration of the real question in issue; when an action is to the court sitting without a jury, the rules of exclusion are less strictly enforced.

*Sladek,* 835 S.W.2d at 313 (quoting *State v. Leigh,* 580 S.W.2d 536, 545 (Mo.App. E.D. 1979), rev'd on other grounds *Leigh v. State,* 639 S.W.2d 406 (Mo.App. E.D. 1982)). Where a case is tried without a jury, we presume that the trial court was not influenced or prejudiced by inadmissible evidence in reaching a judgment unless the record clearly demonstrates that the trial court considered and relied upon the inadmissible evidence. *State v. Ernst,* 164 S.W.3d 70, 74–75 (Mo.App. S.D.2005).

In pronouncing its judgment in the instant case, the trial court related the following:

> [T]he Court has considered all of the evidence in this case and, based upon the injuries sustained, based upon the fact that the child was alone with [Defendant] for approximately five-and-a-half hours, all of the attendant circumstances; the fever, the vomiting, the use of water to revive the child, the use of a towel and ice cubes to cool the child, and then the various statements made as to the cause or causes, simply do not fit in light of the injuries and the overwhelming medical testimony in this case.

The trial court then found that Defendant was guilty beyond a reasonable doubt on all charges. Here, the trial court made no clear and obvious statement of reliance on Skiles' testimony regarding Defendant's uncharged misconduct in reaching its decision. *See Ernst,* 164 S.W.3d at 75. "Nothing in the record shows the trial [court] considered and relied upon [such] evidence in making its determination of guilt beyond a reasonable doubt." *Id.* Defendant has not shown that the inadmissi-

ble evidence played a critical role in the trial court's decision. *Id.*

Furthermore, evidence of Defendant's guilt in this case was strong. "Error which in a close case might call for a reversal may be disregarded as harmless when the evidence of guilt is strong." *State v. Kriebs*, 978 S.W.2d 460, 467 (Mo. App. S.D.1998). Defendant was the only person with Victim when he was injured. His explanation of what happened to Victim was inconsistent with Victim's injuries. The State established through expert testimony that Victim's injuries were consistent with the trauma one would receive in a severe automobile accident or a fall from a two-story building. Two experts testified that Defendant's injuries were consistent with child abuse. Finally, with the severity of Victim's injuries apparent, Defendant failed to seek medical treatment for Victim and threatened Skiles when she attempted to do so.

For the foregoing reasons, we find that even if the evidence in question was improperly admitted, Defendant was not prejudiced by its admission. This point is denied.

In his second point, Defendant argues that the trial court abused its discretion in "permitting [Staab] to testify as an expert regarding whether [Victim's] injuries were consistent with child abuse[.]" Defendant maintains that "Staab was not a medical doctor and was not qualified to reach this conclusion." We disagree.

The question of an expert's qualification rests primarily in the sound discretion of the trial court. *State v. Partridge*, 122 S.W.3d 606, 609 (Mo.App. E.D. 2003). We will reverse only when the trial court's ruling is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *Id.*

In order to qualify as an expert, a witness must have knowledge or skill from education or experience that will aid the trier of fact. *State v. Campbell*, 143 S.W.3d 695, 702 (Mo.App. W.D.2004). "The extent of an expert's experience or training in a particular field goes to the weight, not the admissibility, of the testimony." *Partridge*, 122 S.W.3d at 609. Expert testimony should be admitted if the witness possesses "some qualification." *Id.*

Here, the State established that Staab had been an EMS for seventeen years and a paramedic for fifteen of those years; he had 1,150 hours of training, including training in the proper care and treatment of critically ill or injured children; he had been heavily trained in recognition of child abuse; and, as a mandatory reporter, he had made six to seven hotline calls reporting child abuse. The trial court allowed Staab to testify that he believed Victim's injuries were inconsistent with those he would receive from falling down a hill. Staab also testified that he believed Victim's injuries were consistent with child abuse.

In light of his extensive training and experience in treating children, including the recognition and reporting of child abuse, Staab was qualified to testify as to his observations regarding Victim's injuries. Staab's testimony was drawn from his seventeen years of experience, training, and observations in treating and caring for children. This testimony was relevant to explain the source of Victim's injuries. The trial court did not err in allowing Staab to testify as an expert.

Furthermore, Defendant was not prejudiced by Staab's testimony, because it was cumulative of other expert testimony regarding the source of Victim's injuries. In addition to Staab's testimony,

Dr. Edwards testified, without objection, that Victim's injuries were consistent with child abuse, and inconsistent with being knocked down a hill. "[T]here is no prejudice to the defendant when the allegedly improper evidence was merely cumulative to other evidence that was admitted without objection and established the same facts." *State v. Simms*, 131 S.W.3d 811, 817 (Mo.App. W.D.2004). Point two is denied.

The judgment and sentence of the trial court is affirmed.

BATES, C.J., and LYNCH, J., concur.