**STATE of Missouri, Respondent,**

v.

**Daniel P. AUSTIN,
Defendant/Appellant.**

No. ED 98808.

Missouri Court of Appeals,
Eastern District,
Division Three.

Sept. 3, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 8, 2013.

---

Matthew William Huckeby, Missouri Public Defender Office, St. Louis, MO, for appellant.

Chris Koster, Attorney General, Andrew C. Hooper, Assistant Attorney General, Jefferson City, MO, for respondent.

## OPINION

MARY K. HOFF, Presiding Judge.

Daniel P. Austin (Defendant) appeals from the judgment upon his convictions by a jury for one count of second-degree assault, in violation of Section 565.060, RSMo 2000 [1], one count of armed criminal action, in violation of Section 571.015, and one count of resisting arrest, in violation of Section 575.150, RSMo Supp.2009. The trial court sentenced Defendant, as a persistent misdemeanor offender, to seven years' imprisonment on the assault count, seven years' imprisonment on the armed criminal action count, and four years' imprisonment on the resisting arrest count. The sentences for assault and armed criminal action were ordered to run concurrently to each other while the sentence for resisting arrest was ordered to run consecutively to other counts. We affirm.

### Facts and Procedural Background

Defendant does not challenge the sufficiency of the evidence to support his conviction. Viewed in the light most favorable to the verdict, the evidence adduced at trial established the following relevant facts:

On the morning of May 31, 2010, Kelli Pound (Victim) received several telephone calls from the phone number shared by Victim's daughter (Daughter) and Defendant, who was Daughter's boyfriend. Victim and her husband did not always get along with Defendant, and Victim did not immediately answer the phone. On the third call, Victim finally answered, and Defendant said that he wanted to talk with Daughter. Victim replied that Daughter

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

was not there and hung up the phone. After that, Victim's phone rang again and again, and Victim lost track of how many times Defendant called. Finally, Victim was aggravated, so she picked up the phone and said, "What do you want? I told you [Daughter] is not here." Defendant was very angry and said that he knew Daughter was with Victim and that he would "come in there and f*** everybody up because" he knew Daughter was there. Victim could hear a horn "blaring" through the phone, and Victim's husband told her that Defendant was just outside the house calling from his car. Victim hung up the phone and told her husband "let's go" and "to grab something," meaning he should grab "a pipe or baseball bat," because of previous threats Defendant had made toward Victim and her husband. Victim's husband grabbed a three-foot long hollow metal pipe and followed Victim outside.

Defendant was sitting in his car in front of the house. Victim stood at the bottom of the steps leading to the yard in front of the house. Victim's husband stood in the yard in front of the house. Defendant got out and talked to Victim and her husband over the roof of the car. Victim told Defendant that Daughter was not there but that Victim would tell Daughter to call Defendant when she arrived. Victim told Defendant that he needed to leave. Defendant told Victim that he did not believe her, and Victim replied that she would have Daughter call Defendant but that he needed to leave "now." Victim walked into the street behind Defendant's car and toward the driver's side and asked what was going on between Defendant and Daughter. Defendant appeared to calm down and told Victim that Defendant and Daughter had been arguing and Daughter had left their home. Victim promised Defendant that she would have Daughter call Defendant. Defendant said, "Okay," and got back into his car.

Defendant drove his car toward the intersection at the end of block as Victim began to walk toward her house. Victim was walking slower than usual because she was recovering from previous injuries to her leg, ankle, "sacral area," and vertebrae. Suddenly, Victim heard a screeching noise, looked up, and saw Defendant's car, in reverse, coming straight at her. Victim could not get out of the way. The car hit Victim, throwing Victim onto the car, into the rear windshield, and knocking off her glasses. Victim fell to the ground, face first, hitting her arm and the right side of her back. As Defendant's car struck Victim, Victim's husband struck the car with the pipe he had been holding. Defendant immediately "took off" toward the intersection and drove away. Victim was taken to the hospital and treated for various injuries.

A short time later, police officers arrived at the scene of the incident and spoke with Victim and a witness. After investigating, the officers went to Defendant's apartment to arrest him. When the officers knocked on the door, they saw Defendant in the window of the apartment. The officers repeatedly asked Defendant to come downstairs, but Defendant refused. While talking with Defendant, the officers received another call and left the apartment without arresting Defendant.

Later, one of the officers returned to Defendant's neighborhood in an attempt to locate Defendant. While patrolling the area, the officer saw Daughter screaming and waiving her arms. The officer also saw Defendant standing near his residence, but Defendant ran inside and slammed the door as the officer approached in his patrol car. The officer followed Defendant and tried to open the door, but Defendant locked it. The officer then spoke with Daughter, who stated that

she wanted to move out of and wanted to retrieve her belongings from the apartment. The officer believed that Daughter was a resident of the apartment, so he asked if she would consent to a search of it for Defendant. Daughter provided both verbal and written consent to the search and provided the officer with a key for the locked door. Although the key unlocked the deadbolt lock on the door, it did not work on the doorknob lock.

The officer called for additional officers to respond to the scene. Daughter told the officer that the only other way out of the residence was through a second-story window, so the officer stationed a couple of the other officers on the roof of the building in case Defendant attempted to flee. One of the officers on the roof entered the apartment through the second-story window and found himself in a living room area with a short hallway leading to a bedroom. Although the bedroom was "pretty much empty," a pile of clothes shaped like the "outline of a human being" lay in the middle of the room. The officer asked the person hiding there to come out from under the pile of clothes, but there was no response or movement. Officers began picking up the clothes and found Defendant lying on his back under the pile. As one of the officers tried to grab Defendant's arms as a safety precaution, Defendant began flailing. The officer instructed Defendant to stop resisting and informed Defendant that he was under arrest. Defendant rolled onto his stomach and tucked his arms beneath his torso to stop the officer from handcuffing him. Eventually, two officers were able to force Defendant's arms from underneath his body so that they could handcuff Defendant and take him into custody.

An officer read Defendant his *Miranda*[2] rights, and Defendant indicated that he understood those rights. Later, however, Defendant made a statement to the officer while sitting in a police car. Defendant stated that he had to hit Victim with the car because she would not move from behind it.

After trial, the jury found Defendant guilty as charged. The trial court sentenced Defendant to a total of a total of 11 years' imprisonment. This appeal followed.

Additional facts will be discussed as necessary to our analysis of the issues on appeal.

### Exclusion of Evidence Regarding Credibility of State's Witness

In his first point on appeal, Defendant claims the trial court abused its discretion in sustaining the State's objection and excluding testimony and evidence proffered by Defendant showing that Victim tested positive for cocaine on July 2, 2010, because the testimony and evidence was relevant to Victim's credibility. Defendant argues that he was prejudiced by the exclusion of such evidence in that there is a reasonable probability that the jury would not have convicted him had the evidence been introduced and that the trial court's exclusion of the evidence was clearly against the logic of the circumstances. We disagree.

■■■ This court reviews the trial court's determinations of the admissibility of evidence for abuse of discretion. *State v. Hadley*, 357 S.W.3d 267, 269 (Mo.App. E.D.2012); *State v. Blakey*, 203 S.W.3d 806, 811 (Mo.App.S.D.2006). "A trial court abuses its discretion where its ruling is clearly against the logic of the circumstances and is so arbitrary and unreason-

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

able as to shock the sense of justice and indicate a lack of careful consideration." *Blakey,* 203 S.W.3d at 811. "We review the trial court's admission or exclusion of evidence for prejudice and not mere error, and [we] will affirm the court's ruling unless it was so prejudicial that it deprived the defendant of a fair trial." *Hadley,* 357 S.W.3d at 269–70.

 Generally, the credibility of witnesses is always a relevant issue. *Mitchell v. Kardesch,* 313 S.W.3d 667, 675 (Mo. banc 2010). "Impeachment provides a tool to test a witness's perception, credibility, and truthfulness, which is essential because a jury is free to believe any, all, or none of a witness's testimony." *Mitchell,* 313 S.W.3d at 675. In Missouri, cross-examination of a witness for the purpose of impeaching that witness is permitted through use of the following methods: (1) admission of evidence showing the witness's incapacity or problems with his ability to perceive or memory; (2) admission of evidence of prior convictions; (3) admission of evidence of the witness's bias, interest or prejudice; (4) admission of prior inconsistent statements of the witness; and (5) admission of evidence of the witness's character for truthfulness and veracity. *Id.* However, the trial court, in the exercise of its discretion, can limit the admission of evidence adduced through these methods if the prejudicial value of the evidence outweighs its probative value. *Id.* at 679. "We give trial judges wide latitude to impose reasonable limits on cross-examination to avoid prejudice, confusion of the issues, and interrogation that is only marginally relevant." *State v. Curry,* 364 S.W.3d 756, 758 (Mo.App.E.D. 2012).

According to the record, the State argued a motion *in limine* seeking to exclude evidence that was contained in a medical report showing Victim had tested positive for opiates, morphine, and methamphetamine a few days after the incident involving Defendant. The prosecutor for the State argued that the evidence of the positive drug test was not relevant because the test occurred three to four days following the incident involving Defendant and that such evidence would be misleading to the jury and not probative of anything significant given that that there was no information in the medical report regarding the source of the drugs, including whether the positive test result was due to any medication Victim may have been taking. Defense counsel counter argued that evidence would be elicited showing that Victim had appeared to be high at the time of the incident. Defense counsel argued that the evidence of the positive drug test for methamphetamine should be admitted because it could negatively impact Victim's credibility in that, if she had been high at the time of the incident, her ability to observe and remember the incident could have been affected. Defense counsel further argued that there was nothing to indicate a doctor had prescribed methamphetamine. The trial court thereafter denied the State's motion *in limine.* Defense counsel subsequently stated that other medical records of Victim showing that Victim had tested positive for other drugs in July 2010, approximately six weeks following the incident, were "far away" in time from the incident; thus, defense counsel did not anticipate questioning Victim about those records.

At trial, however, during defense counsel's cross-examination of Victim, the following transpired:

[DEFENSE COUNSEL]: Okay. And [Defendant] never threatened to hit you with a car?

[VICTIM]: He never threatened to hit me with the car, no.

[DEFENSE COUNSEL]: Okay. And you were using methamphetamine at the time of this incident, correct?

[VICTIM]: No.

[DEFENSE COUNSEL]: Okay. Now you were drug tested by your physician on June 3rd and—correct? And you tested positive for methamphetamine?

[VICTIM]: Correct. And I was subsequently blood tested because someone had changed the urine. And I was blood tested and it came up fine. I still see the same physician and I still get my medication, so—they even changed their process there. We go actually to the hospital now to do our drug testing.

. . .

[DEFENSE COUNSEL]: Your Honor, may we approach?

. . .

Your Honor, there are subsequent drug tests which were conducted by the same lab with the exact same, you know, company name and all that located on here where [Victim] tested positive for other drugs subsequent to this incident. I would like to be able to question [Victim] about the fact that they used the same lab. [Victim] continued getting the same through—her doctor continued getting the same reports from the same lab.

. . .

[PROSECUTOR]: I don't know that that disputes what you are saying as far as where she was tested.

[DEFENSE COUNSEL]: I think it does, because it is the exact same question that was given. She's trying to say that there were different tests done. There's no records of those different tests.

[PROSECUTOR]: I don't believe she said different test. She said different

process and she went to a different place.

THE COURT: Let her clarify that first.

[DEFENSE COUNSEL]: Okay. Thank you. I am going to check the other records.

(The proceedings returned to open court).

[DEFENSE COUNSEL]: [Victim], when your doctor does your drug testing, he used a company call "Merlitox". Is that correct?

[VICTIM]: I do not know what the company name is. We just went in and we used the restroom. We put it in a joint basket where everybody put their things. It was unattended and they would send them off to the lab.

[DEFENSE COUNSEL]: So where was the test conducted on June 3rd?

[VICTIM]: I don't know. I just went to the restroom and—

THE COURT: You went—

[VICTIM]: At the doctor's office is where I urinated.

THE COURT: On June the 3rd?

[VICTIM]: Correct.

THE COURT: At a doctor's office?

[VICTIM]: Correct.

THE COURT: Is this a private doctor?

[VICTIM]: Correct.

THE COURT: Okay.

[DEFENSE COUNSEL]: You were subsequently drug tested on July the 2nd by your same physician?

[VICTIM]: Okay.

[DEFENSE COUNSEL]: Okay? And where was that drug testing conducted?

[VICTIM]: The same office.

[DEFENSE COUNSEL]: Okay. And that was sent to the same lab then?

[VICTIM]: I am not sure because they had changed things a couple of times. They had to. Where before they

changed it for us to go to the hospital to do our drug testing. They brought someone in from a different lab that came and actually stood outside and took your urine from you, so—and I am not sure what months that they made those changes.

[DEFENSE COUNSEL]: Okay.... Your Honor, may we approach?

THE COURT: Yes.

(Counsel approached the bench and the following proceedings were had).

[DEFENSE COUNSEL]: Since she indicated that the test was conducted at the same place I would like to go ahead and ask her about the positive cocaine result then.

[PROSECUTOR]: I will object. I believe this is what we discussed in chambers. That test was not until July, which was long after this incident happened. I don't believe it—I understand the June test is close in time, and that was why it was admitted. I don't believe the same is true for the test in July. I don't believe it is probative.

[DEFENSE COUNSEL]: Judge, I believe she has testified that she didn't use meth but she tested positive for methamphetamine on this occasion and cocaine the next occasion. I think that's relevant to show that she is not credible when she was saying she was not on methamphetamine.

. . .

THE COURT: I don't have the transcript. I don't have the transcript. Her answer to—what was the answer to the question? How are you getting to this point?

[DEFENSE COUNSEL]: She did not use methamphetamine and that it was a mistake in the drug test. This shows that she tested positive for another controlled substance a month later. I think that's relevant, that the jury should get

to hear that she's lying about using meth because there's a positive test for methamphetamine in a subsequent.

[PROSECUTOR]: Then cocaine, not for the same drug.

THE COURT: Stop. You are obfuscating. You are not staying with the same drug.

[PROSECUTOR]: No, she is not staying with the same drug.

[DEFENSE COUNSEL]: They are both controlled substances. They are both illegal. They were not prescribed by her doctor. I think it is relevant to her credibility.

THE COURT: You are confusing me, [Defense Counsel]. Don't confuse me.

[DEFENSE COUNSEL]: She is saying here that in May she did not—that her June—their test—

THE COURT: So May, June, you see what you are doing? Stop it.

[DEFENSE COUNSEL]: She was tested in early June, three days after this incident. And the result indicated that she tested positive for methamphetamine.

THE COURT: Now stop. Is that now before the jury?

[DEFENSE COUNSEL]: Yes, it is. She said she did not use it.

THE COURT: That's right. Go ahead.

[DEFENSE COUNSEL]: She said she did not use meth. It was a mistake from the lab. Now her next drug test is on July 2nd, and she tested positive for cocaine. And it was conducted by the same lab.

THE COURT: So now we are talking about cocaine.

[DEFENSE COUNSEL]: Correct. What I would like to argue is that she is saying that she wasn't using controlled substance, methamphetamine, but the

next month see tested positive for another controlled substance.

THE COURT: So—

[DEFENSE COUNSEL]: She's lying to the jury about being on meth at the time of the incident because the drug test shows she was on methamphetamine and there are no subsequent test results.

THE COURT: If you are making a motion to—State is making a motion is exclude this, I will sustain the motion.

[PROSECUTOR]: Thank you, Your Honor.

THE COURT: Not the same thing. Talking apples and oranges. All right. Very well.

Defense counsel subsequently made an offer of proof outside the hearing of the jury:

[DEFENSE COUNSEL]: [Victim], you testified that you were not using methamphetamine at the time of this incident?

[VICTIM]: That is correct.

[DEFENSE COUNSEL]: And that you believe your drug test from June 3rd was a mistake.

[VICTIM]: Correct.

[DEFENSE COUNSEL]: Okay. Were you drug tested when you went to the doctor on July 2nd of 2010?

[VICTIM]: I am always drug tested.

[DEFENSE COUNSEL]: Okay. And that result came back positive for cocaine, correct?

[VICTIM]: I have no clue. Nobody said anything to me.

[DEFENSE COUNSEL]: Okay. Your Honor, I would like to submit as an exhibit for the offer of proof—I am not sure what I need, the letter, it is the positive cocaine test with a note from the doctor indicating that it was positive for cocaine.

THE COURT: Very well. Your point is?

[DEFENSE COUNSEL]: So it is your claim that you did not use cocaine?

[VICTIM]: No, ma'am. I have never used cocaine in my life.

[DEFENSE COUNSEL]: Okay. So it's your claim that you had two false positive tests from the lab in a row?

[VICTIM]: Correct. If that—they never said anything to me about the second one. I don't know. And like I said, if anything was ever in question, they would just do a blood test, so—and they reined in their procedures on their part.

[DEFENSE COUNSEL]: Okay.... Judge, the point would be that it's unlikely that there are two positive drug tests for two different drugs within a month of each other. And I believe the jury should get to hear what [Victim] says. The first one was a mistake, that she also says the second one was either a mistake or no one bothered to tell her about it. Because I believe it goes to her credibility.

. . .

THE COURT: Your response?

[PROSECUTOR]: Yes, Your Honor. My response is two fold. I don't believe that the evidence [Defense Counsel is] offering is probative to this incident, in and of itself. By that I mean—

THE COURT: Probative of what?

[PROSECUTOR]: The incident on May 31st, as this drug test happened in July. I don't believe that if she was on any substances in July that it is probative to the incident that happened in May. And my second objection would be that I don't believe that it directly impeaches anything that she has testified to on the stand. And therefore I don't believe

that it should be admitted on either one of those grounds.

. . .

THE COURT: All right. I will sustain the State's objection to this line of questioning. It is distracting from the main issues in the case. The limited probative value it has is outweighed by the distractions. All right. Very well.

▄▄▄ Here, the trial court did not abuse its discretion in excluding cross-examination testimony regarding whether Victim tested positive for cocaine in July 2010 because such evidence was immaterial to whether Defendant struck Victim with his car or Victim's perception of the incident involving Defendant in May 2010. Moreover, after reviewing the record, we find that such testimony only would have confused the issues before the jury on a subject that was of no real significance to the question of Defendant's guilt rather than to simply discredit Victim. Additionally, Defendant was not prejudiced by the exclusion of the cross-examination testimony given the eye-witness testimony of Victim's step-father, who lived next door to Victim and had observed the incident as it occurred. Similarly, given the testimony of police officers who had pursued Defendant when he fled and hid as they attempted to arrest him a few hours after the incident, the jury was entitled to infer Defendant was conscious of his guilt. *State v. Jones*, 296 S.W.3d 506, 510 (Mo. App.E.D.2009) (defendant's flight upon realizing the presence of police can constitute evidence of guilt). Point denied.

*Denial of Defendant's Motion in Limine*

In his second point on appeal, Defendant claims the trial court plainly erred in denying his pretrial motion *in limine* to exclude evidence of Defendant's prior alleged threats against Victim and in admitting such evidence, which constituted propensi-

ty evidence that was neither legally nor logically relevant and substantially prejudiced Defendant.

Normally, we review the trial court's determinations of the admissibility of evidence for abuse of discretion. *Hadley*, 357 S.W.3d at 269; *Blakey*, 203 S.W.3d at 811. "A trial court abuses its discretion where its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Blakey*, 203 S.W.3d at 811. "We review the trial court's admission or exclusion of evidence for prejudice and not mere error, and [we] will affirm the court's ruling unless it was so prejudicial that it deprived the defendant of a fair trial." *Hadley*, 357 S.W.3d at 269–70. However, in this case, Defendant concedes that this issue was not preserved for appellate review and, therefore, requests plain error review under Rule 30.20.

▄▄▄ "Plain error review is used sparingly only in those limited cases where there is a clear demonstration of manifest injustice or miscarriage of justice." *State v. Cannady*, 389 S.W.3d 306, 310 (Mo.App. S.D.2013). It is within this Court's discretion whether to review unpreserved errors for plain error. Rule 30.20. Plain error is error that is evident, obvious, and clear. *State v. Moore*, 252 S.W.3d 272, 275 (Mo. App.S.D.2008). The defendant bears the burden of showing not only that plain error occurred, which resulted in manifest injustice or a miscarriage of justice, but also that the error was outcome determinative. *State v. Placke*, 290 S.W.3d 145, 153 (Mo.App.S.D.2009); *Moore*, 252 S.W.3d at 275.

▄▄▄ "A criminal defendant has the right to be tried only for the offense for which he is charged." *Blakey*, 203 S.W.3d at 811. "Therefore, evidence of un-

charged crimes or prior misconduct is inadmissible if offered for the purpose of showing a defendant's propensity to commit the crime with which he is charged." *Id.* Evidence of uncharged crimes or prior misconduct is admissible, however, if it is logically relevant in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial and if it is legally relevant in that its probative value outweighs its prejudicial effect. *Id.* "Generally, evidence of other uncharged crimes or prior misconduct is logically relevant when it tends to establish: (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan, or (5) the identity of the person charged." *Id.* at 811–12. Additionally, an exception is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged, which is admissible to present a complete and coherent picture of the events that occurred. *Id.* at 812.

Before trial, defense counsel filed a motion *in limine* to preclude evidence of threats Defendant made toward Victim prior to the incident in which he hit her with his car. During argument on the motion, defense counsel argued that evidence of such prior threats was irrelevant to Defendant's guilt of the offenses charged. The State argued that evidence of the prior threats was relevant to show Defendant's state of mind and animosity toward Victim as well as his intent to injure Victim when he struck Victim with the car. The trial court allowed the evidence of the prior threats into evidence.

At trial, Victim testified that Defendant had made physical threats against her prior to the incident in which he struck Victim with his car. Victim testified that Defendant had threatened to throw a brick through Victim's bedroom window and to hit her in the head with it; that Defendant had threatened to smash her brains and to write her name with her brains on the sidewalk; and that Defendant had threatened to cut her throat from ear to ear with broken glass. Victim testified that Defendant made these threats in March or April 2010, around the time Daughter had moved out of Defendant's residence and into Victim's home. Victim further testified that Daughter moved back into Defendant's residence in May 2010. Victim testified that, on the morning of the incident, Daughter had called Victim and had said she needed to come to Victim's home and asked Victim to unlock the front door. Victim testified that Defendant arrived at Victim's home a short time later looking for Daughter. Although Victim informed Defendant that Daughter was not at Victim's home, Defendant did not believe Victim and became agitated before hitting Victim with his car. Defendant did not object to any of this evidence.

▮▮▮▮ Here, we find no error, plain or otherwise. The evidence of prior threats Defendant had made toward Victim was relevant to establish that Defendant had a motive to injure Victim, had the intent to injure Victim, and had made no mistake and had not had an accident when he hit Victim with his car. Defendant threatened to injure Victim around the time that Daughter left Defendant and moved in with Victim. Defendant actually injured Victim when Defendant believed Daughter had gone to Victim's home. Moreover, the outcome of trial would not have been different absent Victim's testimony regarding the prior threats of violence given the overwhelming evidence of Defendant's guilt, which included the testimony of an eye witness and of police officers who pursued and found Defendant after he fled and hid from them as they attempted to arrest him. Point denied.

*Conclusion*

The judgment of the trial court is affirmed.

KURT S. ODENWALD and ANGELA T. QUIGLESS, Judges, concur.