

# In the Missouri Court of Appeals
# Eastern District

### DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED102277 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | 1111-CR05528-01 |
| | ) | |
| CECIL RUSSELL MCBENGE, | ) | Honorable Daniel G. Pelikan |
| | ) | |
| Appellant. | ) | Filed: November 15, 2016 |

Cecil Russell McBenge ("Defendant") appeals the judgment entered upon a jury verdict

convicting him of first-degree murder for his alleged involvement in the 1984 killing of Eleonora

Knoernschild ("Victim"). We reverse and remand for a new trial.

### I.     BACKGROUND

Over two decades after Victim's murder, a DNA analysis linked Defendant and his

brother Brian McBenge[1] to evidence found on or near Victim's property shortly after she was

killed. In separate underlying cases, Defendant and Brian were each charged with and found

guilty by a jury of first-degree murder based on accomplice liability.[2] The State's third

substitute information in lieu of indictment in Defendant's case ("the information") charging him

with first-degree murder alleged he acted in concert with another, and after deliberation,

---

[1] Because Defendant and his brother Brian share the same last name, we will refer to Brian by his first name for clarity and ease of reading.

[2] Like Defendant, Brian appealed the trial court's judgment entered upon a jury verdict in his case convicting him of first-degree murder, and some of Brian's points on appeal are similar to those raised by Defendant in this appeal. Our Court's opinion in *State of Missouri v. Brian Keith McBenge* (No. ED102147), which reverses the judgment in Brian's case and remands his cause for a new trial, is handed down the same day as this decision involving Defendant.

knowingly caused the death of Victim on or between November 2nd and 4th of 1984 by beating her. The information also gave Defendant notice that the State may submit an instruction for second-degree felony murder to the jury based on the death of Victim as a result of Defendant's perpetration of the class B felony of first-degree burglary. Defendant's jury trial was held on September 22-October 3, 2014.

## A.    Evidence Presented at Defendant's Trial

Viewed in the light most favorable to the verdict, the following evidence was presented at Defendant's trial.[3]

### 1.    Evidence Relating to Circumstances and Events Occurring in the Years Prior to Victim's Murder, including the 1980 Burglary of Victim's Home

Defendant's brother Brian met Victim's granddaughter ("Granddaughter") in 1977 when they were both teenagers and they eventually started dating. They dated for approximately eight months until sometime in 1979. During the timeframe Brian and Granddaughter were dating, they would frequently go to Victim's home and spend time in her kitchen. It was not unusual for Brian and Granddaughter to eat while they were at Victim's home. In addition, while Brian was dating Granddaughter, he became aware Victim kept extra cash in a Calumet baking powder can ("the Calumet can") located in the lower kitchen cabinets next to her refrigerator, because Brian saw Granddaughter steal money from the Calumet can when Victim was not looking. Granddaughter testified she met Defendant sometime in 1979, when the two of them were attending the same children's home.

In March of 1980, Victim's house was broken into while she was in the hospital. Police classified the break-in of Victim's home as a burglary ("the 1980 burglary").[4] Around the time

---

[3] We note there is some evidence which was presented at Defendant's trial that was not presented at Brian's trial and vice versa.

[4] To avoid unnecessary repetition, a more detailed account of the evidence relating to the 1980 burglary will be set out in Section II.B.1. of this opinion.

2

the crime occurred, police officers lifted a latent fingerprint from the refrigerator door handle; however, it went unidentified until 1986, when officers determined the fingerprint belonged to Defendant's brother Brian. Nevertheless, Brian was not a suspect in the 1980 burglary near the time it occurred and he was never charged in connection with the crime.[5] In addition, Defendant was not ever a suspect in or charged with the 1980 burglary.

Sometime after the 1980 burglary, Victim had bars installed on the basement windows of her home. Victim also moved the Calumet can to her bedroom.

### 2. Evidence Relating to Circumstances Surrounding Victim's 1984 Murder and the Subsequent Police Investigation of the Crime

Victim's murder occurred sometime between November 2nd and November 4th of 1984. Around that same timeframe, Defendant and his brother Brian lived in a home located about one mile away and within walking distance of Victim's home.

On November 2, 1984, before Victim's body was discovered, Victim's longtime housekeeper cleaned Victim's home, including the kitchen and kitchen floor. The housekeeper testified Victim always kept her house tidy, with everything put in its proper place.

During the morning of November 4, 1984, Victim's daughter called the police after she went to Victim's home to bring her the newspaper and noticed the glass window on the front door had been broken out and removed. Police responded to Victim's home, searched the premises, and conducted an investigation which revealed the following.

Police discovered a person or persons had gained entry to Victim's home. It appeared that whoever entered Victim's home crawled through the space where the glass window on the

---

[5] Presumably, Brian was not charged with the 1980 burglary because he was not linked to the crime until 1986, which would have been after the expiration of the three-year statute of limitations for prosecutions of class C felonies. *See* sections 556.036.1, .2(1), and .4 RSMo 1978 (effective 1-1-79) (providing that a prosecution for any felony other than murder or a class A felony must generally be commenced within three years of when the offense is committed); sections 569.170.1 and .2 RSMo 1978 (effective 1-1-79) (second-degree burglary is a class C felony which occurs when a person "knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein").

front door had been, because the front door was still locked. Victim's bedroom, kitchen, basement, and hallway had been ransacked, and several drawers, cabinets, and items were opened throughout the house.

In the bedroom, Victim's body was found lying on the floor underneath clothes and papers which had been thrown around. Victim, who was elderly and weighed less than one-hundred pounds, had blood and multiple bruises on her face, a split lip, and two broken ribs on each side of her body caused by blunt force. In addition, part of the bedspread was looped around Victim's neck as if she might have been strangled. However, Dr. Clarke Harding, the pathologist who performed Victim's autopsy, determined she did not die from strangulation. Instead, Dr. Harding determined Victim's cause of death was repeated blunt trauma, from being beaten multiple times. Dr. Harding testified he could not determine how many people had beaten Victim.

Two kitchen-type knives and lock boxes were found on the bedroom floor, and the Calumet can was found in Victim's bedroom closet, which was open and appeared to be ransacked. There were two dressers in the bedroom, both of which had multiple drawers open and at least one drawer rummaged through extensively. In addition, the tops of both dressers were in disarray. A total of eight nylon stockings, which all appeared to be the same style and size, were found in the bedroom; some of them were hanging from one of the dresser drawers and the others were lying on the floor. In addition, some of the bedding was rolled up toward the head of the bed, while other bedding was on the floor.

In the kitchen, four lower cabinets and two drawers next to Victim's refrigerator were open, but the top cabinets were closed. Various items were dumped out on the kitchen countertop; the bread box and multiple containers were open; and gloves were found on the kitchen floor. Finally, the refrigerator door and crisper drawer were open, and lying on the floor in front of the refrigerator were a large plastic bag containing some grapefruit, a frozen meal, a

4

Tupperware container, a piece of cheese with a bite mark taken out of it, and an empty single-serve cheese wrapper.

In the basement, lock boxes had been dumped on the floor and personal papers were spread across the floor. In the hallway, doors on two cabinets were opened and items were dumped on the floor. In the dining room, one cabinet had a drawer which was open and another cabinet had a door which was open.

Outside the house, near the back of Victim's property by an alley, two nylon stockings were found lying on the ground. Victim's flashlight, which she usually kept on top of shelves built into the headboard of her bed, was found a little farther away across the alley. In addition, two gloves, one blue and one maroon, were found in a bush in the front yard of a nearby house.

Police suspected more than one person was involved in the 1984 crime because of the two knives found in Victim's bedroom and evidence of two pairs of gloves found in the kitchen and outside of Victim's property. DNA testing was not performed until 2011 on, *inter alia*, the cheese wrapper found on the floor of Victim's kitchen, the two nylon stockings found by the alley near the back of Victim's property, and the blue glove found in the bush of a nearby home. Daniel Fahnestock, who worked for the crime lab at the St. Charles County Sheriff's Department, conducted DNA testing on the items. The presence of DNA found on the items was compared with Defendant's and his brother Brian's DNA, who were both Caucasians, as well as Victim's DNA. Testing performed on the cheese wrapper revealed the presence of single-source DNA on the wrapper which was consistent with Brian's DNA, and the probability of someone else in the general Caucasian population having the same DNA profile was 1 in 741,000. In addition, testing performed on the two nylon stockings revealed the presence of only Victim's DNA on one stocking but a mixture of her DNA and a male's DNA on the other stocking. The male DNA found on the stocking was consistent with Defendant's DNA, and the probability of someone else in the general Caucasian population having the same DNA profile was 1 in 6.17

5

million.[6]  Finally, testing performed on the blue glove revealed the presence of DNA which was consistent with Victim's DNA.

**B.      Defendant's Arguments Raised at Trial and Other Relevant Procedural Posture**

At the close of the State's evidence and at the close of all of the evidence, Defendant filed motions for judgment of acquittal which asserted the State failed to prove the elements of the crimes alleged in the information.

During Defendant's jury trial, he objected to the admission of evidence relating to the 1980 burglary of Victim's home, arguing it was improper evidence of a prior uncharged crime. In addition, over Defendant's continuing objection, Officer Leslie Simpson,[7] who was present at the crime scene after the 1980 burglary of Victim's home and after the 1984 break-in of Victim's home and her murder, was allowed to testify about the details of the 1980 burglary and the similarities between the two crimes.

Defendant also made an objection to admission of the cheese wrapper and the stocking, arguing both items should be excluded from evidence because the State could not provide a reasonable assurance that they were in substantially the same condition when tested as they were when they were originally seized.  In addition, Defendant objected to the admission of some of the exhibits and testimony from Fahnestock pertaining to DNA testing on the cheese wrapper, on the grounds the evidence concerned DNA data which was unreliable.

The trial court denied Defendant's motions for judgment of acquittal.  The court also overruled Defendant's objections to the admission of evidence relating to the 1980 burglary, the

---

[6] Unless otherwise indicated, all future references to a "stocking" are to the one found to have contained the presence of a mixture of DNA consistent with Victim's and Defendant's DNA.
[7] Officer Simpson, like many of the testifying officers, was retired by the time of Defendant's trial.  All references to officers in this opinion include officers who were active and retired at the time of Defendant's trial.

6

admission of the cheese wrapper, the admission of the stocking, and the admission of the challenged evidence pertaining to the DNA testing on the cheese wrapper.[8]

The State submitted an instruction for first-degree murder to the jury and an alternate instruction for second-degree felony murder. Both instructions were based on accomplice liability. The first-degree murder instruction, Instruction No. 5, required the jury to find, *inter alia*, that Defendant acted alone or aided or encouraged his brother Brian in causing Victim's death by beating her and did so after deliberation. The second-degree felony murder instruction, Instruction No. 7, required the jury to find that: Defendant committed first-degree burglary at Victim's home as submitted in Instruction No. 8; Defendant or his brother Brian beat Victim during the burglary; and Victim was killed as a result of the perpetration of the burglary. Finally, Instruction No. 8 required the jury to find that: between November 2nd and 4th of 1984, Defendant or Brian knowingly entered Victim's home; Defendant or Brian did so for the purpose of committing the crime of stealing therein; while Defendant or Brian was in Victim's home, Victim was present therein and was not a participant in the crime; and with the purpose of promoting or furthering the commission of first-degree burglary, Defendant acted alone or Defendant acted together with or aided Brian in committing the offense.

Three verdict forms were submitted to the jury and the jury could either, (1) find Defendant guilty of first-degree murder as submitted in Instruction No. 5; (2) find Defendant guilty of second-degree felony murder as submitted in Instruction No. 7; or (3) find Defendant

---

[8] Additional evidence relevant to Defendant's motions and objections will be set out as needed in Section II. of this opinion.

not guilty of both crimes.[9]  The jury found Defendant guilty of first-degree murder.

Defendant then filed a motion for judgment of acquittal notwithstanding the verdict of the jury, or in the alternative, for a new trial ("post-trial motion"), which raised the same arguments discussed at the beginning of this subsection and all but one of the claims he brings in this appeal.[10]  The trial court denied Defendant's post-trial motion, entered a judgment in accordance with the jury's verdict convicting Defendant of first-degree murder, and sentenced Defendant to life imprisonment without parole.  Defendant appeals.

## II.    DISCUSSION

Defendant raises seven points on appeal.  In his first point on appeal, Defendant argues there was insufficient evidence to support his first-degree murder conviction under a theory of accomplice liability.  And in his remaining points on appeal, Defendant asserts the trial court erred in making various evidentiary rulings.

### A.    Whether there was Sufficient Evidence to Support Defendant's Conviction for First-Degree Murder under a Theory of Accomplice Liability

In Defendant's first point on appeal, he argues there was insufficient evidence to support his first-degree murder conviction under a theory of accomplice liability.  Because Defendant's argument explicitly and inherently challenges the trial court's denial of his motions for judgment of acquittal prior to submission of his first-degree murder charge to the jury, the question of sufficiency is really an issue of whether the charge should have been submitted to the jury.  *See State v. Myles*, 479 S.W.3d 649, 660 (Mo. App. E.D. 2015).

---

[9] There was no verdict form submitted which allowed the jury to find Defendant guilty of first-degree burglary as submitted in Instruction No. 8.  Defendant was not charged with that crime, presumably because he was not a suspect in the 1984 break-in and murder until 2011, which would have been after the expiration of the three-year statute of limitations for prosecutions of class B felonies.  *See* sections 556.036.1, .2(1), and .4 RSMo 1978 (effective 1-1-79) (providing that a prosecution for any felony other than murder or a class A felony must generally be commenced within three years of when the offense is committed); sections 569.160.1(3) and .2 RSMo 1978 (effective 1-1-79) (first-degree burglary is a class B felony which occurs when, *inter alia*, a person knowingly enters unlawfully into a structure for the purpose of committing a crime therein and there is another person present who is not a participant in a crime).

[10] Defendant's post-trial motion did not include the claim raised in his seventh point on appeal.

### 1. Standard of Review

Appellate review of a claim that there was insufficient evidence to support a criminal conviction is limited to a determination of "whether the [S]tate has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." *State v. Hosier*, 454 S.W.3d 883, 898 (Mo. banc 2015). In making that determination, great deference is given to the trier of fact, and an appellate court will not weigh the evidence anew. *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011). Additionally, all evidence and inferences favorable to the State are accepted as true, and all contrary evidence and inferences are disregarded. *Id*. However, an appellate court "may not supply missing evidence, or give the [S]tate the benefit of unreasonable, speculative or forced inferences." *State v. Clark*, 490 S.W.3d 704, 707 (Mo. banc 2016) (quoting *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001) (overruled on other grounds)).

The State may meet its burden of proof by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime. *State v. Burns*, 444 S.W.3d 527, 529 (Mo. App. E.D. 2014). Furthermore, circumstantial evidence is given the same weight as direct evidence in considering whether there was sufficient evidence to support a conviction. *Id*. at 528-29.

### 2. The Relevant and Admissible Evidence Adduced at Trial

The following relevant and admissible evidence was adduced at trial.[11] Victim's Granddaughter testified that while she and Defendant's brother Brian were dating in the years

---

[11] In his second, third, and fourth points on appeal, Defendant argues that evidence relating to the 1980 burglary, the cheese wrapper, and the stocking were inadmissible. We do not refer to evidence relating to the 1980 burglary in this subsection for two reasons. First, we find such evidence is not relevant to the determination we must later make in the discussion of this point on appeal, i.e., whether there was sufficient evidence to support Defendant's first-degree murder conviction and specifically whether the State met its burden to show Defendant personally deliberated on Victim's death. In addition, as discussed in Section II.B.1. below, we hold that evidence relating to the 1980 burglary was inadmissible at Defendant's trial. However, we do refer some evidence pertaining to the cheese wrapper and stocking in this subsection because it is relevant to our discussion in this point and because, as discussed in Section II.B.2. below, we hold that evidence was admissible at Defendant's trial.

9

prior to Victim's murder, Brian frequently went with Granddaughter to Victim's home and spent time in Victim's kitchen, and it was not unusual for Brian and Granddaughter to eat while they were at Victim's home. Granddaughter also testified that during that same timeframe, Brian became aware Victim kept extra cash in the Calumet can located in the lower kitchen cabinets next to her refrigerator, because Brian saw Granddaughter steal money from the Calumet can when Victim was not looking. Granddaughter also testified she met Defendant around the time she and Brian were dating.

The 1984 break-in of Victim's house and her murder occurred very shortly after Victim's longtime housekeeper cleaned various areas of Victim's house and kitchen, which Victim always kept tidy. Around the two-day window in which the break-in and murder were committed, Defendant and Brian lived in a home located about one mile away and within walking distance of Victim's home.

Police discovered a person or persons had gained entry to Victim's home in 1984 by breaking out the glass window on the front door and crawling through that empty space. Several areas of Victim's home were ransacked, including the lower kitchen cabinets next to her refrigerator and the refrigerator itself. The refrigerator door was found open, and lying on the floor in front of the refrigerator were several food items including a piece of cheese with a bite mark taken out of it and an empty single-serve cheese wrapper. In addition, eight nylon stockings were found in Victim's bedroom, and two nylon stockings were found lying outside near the back of Victim's property by an alley.

In the bedroom, Victim's body was found lying on the floor. Victim, who was elderly and weighed less than one-hundred pounds, had blood and multiple bruises on her face, a split lip, and two broken ribs on each side of her body caused by blunt force. Victim's cause of death was subsequently determined to be repeated blunt trauma, from being beaten multiple times. Nevertheless, Dr. Harding, the pathologist who performed Victim's autopsy, testified he could

10

not determine how many people had beaten Victim.  In addition, there was no DNA evidence found in the bedroom which linked Defendant or his brother Brian to Victim's killing.

However, DNA testing on the empty single-serve cheese wrapper found on the floor of Victim's kitchen revealed the presence of single-source DNA on the wrapper which was consistent with Brian's DNA, and the probability of someone else in the general Caucasian population having the same DNA profile was 1 in 741,000.  In addition, DNA testing on one of the stockings found by the alley near the back of Victim's property revealed the presence of a mixture of DNA consistent with Victim's and Defendant's DNA, and the probability of someone besides Defendant in the general Caucasian population having the same DNA profile was 1 in 6.17 million.

**3.      General Law Pertaining to the State's Burden of Proof**

A person commits the crime of first-degree murder if "he knowingly causes the death of another person after deliberation upon the matter."  Section 565.020.1 RSMo Supp. 1984.[12] "Deliberation" is defined as "cool reflection for any length of time no matter how brief[.]" Section 565.002(3).  The requirement of deliberation distinguishes first-degree murder from all other forms of homicide.  *State v. Glass*, 136 S.W.3d 496, 514 (Mo. banc 2004).

Where, as in this case, a defendant is tried for first-degree murder under a theory of accomplice liability, it is not necessary for him to have personally performed each act constituting the elements of the crime or for him to have been present when the victim was killed.  *State v. Ferguson*, 20 S.W.3d 485, 497 (Mo. banc 2000); *State v. Gray*, 887 S.W.2d 369, 377 (Mo. banc 1994).  Nevertheless, in order to be responsible for another person's acts, a defendant must have acted together with or aided the other person either before or during the

---

[12] Unless otherwise indicated, all further statutory references are to RSMo Supp. 1984, which incorporates legislative amendments through 1983.  The 1983 amendments relevant to this appeal had an effective date of October 1, 1984, which was approximately one month before Victim's murder which took place sometime between November 2nd and 4th of 1984.  Therefore, the 1983 amendments govern this appeal.  Any amendments made to statutes at issue in this case which went into effect after November 4, 1984 are not relevant to this appeal.

commission of the murder with the purpose of promoting the crime. *Ferguson*, 20 S.W.3d at 497. In addition, the State must prove that the defendant personally deliberated upon the murder. *Id.* Consistent with those principles, the Missouri Supreme Court has held the State makes a submissible case of first-degree murder under a theory of accomplice liability only if it introduces evidence from which a reasonable juror could have concluded beyond a reasonable doubt that, (1) the defendant committed acts which aided another in killing the victim; (2) it was the defendant's conscious purpose in committing those acts that the victim be killed; and (3) the defendant committed the acts after he personally deliberated on the victim's death. *State v. O'Brien*, 857 S.W.2d 212, 216-18 (Mo. banc 1993).

### 4. The Missouri Supreme Court's Decision in *State v. O'Brien* and Other Subsequent Missouri Supreme Court Precedent

In *State v. O'Brien*, the Missouri Supreme Court held the State did not make a submissible case of first-degree murder under the preceding standard where the following evidence was adduced at trial. *Id.* at 218-20. While the defendant and his roommate Daniel Blount were at a bar, Blount solicited the defendant's help in robbing fellow patron Sanford Wood ("victim"), telling the defendant that, if he would just "lure" the victim outside, Blount would "take care of the rest." *Id.* at 216 (quotations in original). The defendant agreed, asked the victim to step outside, and all three men left the bar. *Id.* After the defendant and the victim had a brief conversation, defendant walked away and witnessed Blount pull the victim into a gangway, knock him down, and reach into the victim's pockets. *Id.* Subsequently, another bar patron found the victim in the gangway, barely alive. *Id.* The victim later died from blunt force injuries which were consistent with having been inflicted by someone stomping on his head. *Id.*

In the meantime, the defendant and Blount both went to a friend's house. *Id.* Blount announced that he had murdered someone, he displayed some cash he had taken, and his shoes

12

appeared to have blood on them.  *Id*.  Blount offered the defendant some of the victim's money, but the defendant refused.  *Id*.

The defendant was charged with, *inter alia*, first-degree burglary, first-degree murder, and the lesser-included offense of second-degree felony murder[13] based on the death of victim as a result of defendant's perpetration of first-degree burglary.  *Id*. at 216-17, 220.  The jury found the defendant guilty of first-degree burglary and first-degree murder under a theory of accomplice liability.  *Id*. at 217.  Defendant appealed, arguing there was insufficient evidence to support his first-degree murder conviction.  *Id*. at 215.

The *O'Brien* Court held the State did not make a submissible case as to the second and third elements of a first-degree murder charge based on accomplice liability, because a reasonable juror could not have found or inferred the defendant intended the victim's death or that he coolly deliberated the victim's fate.  *Id*. at 218.  In reaching that conclusion, the Missouri Supreme Court found that although an intent to kill may be inferred from the use of a deadly weapon, there was no deadly weapon used to kill the victim under the facts of the case, and the evidence was insufficient to impute any of Blount's alleged intent to the defendant where Blount killed the victim by stomping him to death absent an agreement to kill the victim.  *Id*.  The Court also found that while deliberation is ordinarily proved through proof of the circumstances surrounding the killing in cases where the defendant personally caused the death of the victim, "[w]here the defendant is simply an accessory and does not participate in the act of killing, any

---

[13] Second-degree felony murder is not considered a "nested" lesser-included offense because its elements are not a subset of the higher offense of first-degree murder in that the offense of second-degree felony murder requires proof of additional facts from those required to prove first-degree murder. *State v. Blurton*, 484 S.W.3d 758, 765, 766 (Mo. banc 2016). Nevertheless, second-degree felony murder is a lesser-included offense of first-degree murder because it is denominated as such by statute. *Id*. at 763 n.1, 766 (referring to more recent versions of relevant statutes); section 556.046.1(2) RSMo 1978 (effective date 1-1-79) (an offense is a lesser-included offense when, *inter alia*, "[i]t is specifically denominated by statute as a lesser degree of the offense charged"); sections 565.025.2(1)(a) and 565.021.1(2) (second-degree felony murder is a lesser-included offense of first-degree murder).

inferences which may be raised by the manner in which the victim was killed cannot serve to prove the defendant's premeditation." *Id*. at 218-19.

Missouri Supreme Court cases handed down after *O'Brien* expounded upon when deliberation may be inferred in a case where a defendant is tried for first-degree murder under a theory of accomplice liability. In *State v. Rousan* and *State v. Gray*, the Supreme Court identified three "highly relevant" circumstances which are properly attributable to such a defendant and may support an inference that he deliberated: (1) "the defendant or [his accomplice] in the defendant's presence made a statement or exhibited conduct indicating an intent to kill prior to the murder"; (2) "the defendant knew that a deadly weapon was to be used in the commission of a crime and that weapon was later used to kill the victim"; and (3) "the defendant participated in the killing or continued with a criminal enterprise after it was apparent that a victim was to be killed." 961 S.W.2d 831, 841 (Mo. banc 1998); 887 S.W.2d at 376-77.

**5.    Analysis as to Whether there was Sufficient Evidence Defendant Committed First-Degree Murder under a Theory of Accomplice Liability**

Before discussing the applicability of the previously-discussed precedent to the facts in the case at bar, we must initially acknowledge that the circumstances of this case and the one involving Defendant's brother Brian, also handed down today, are troubling. First, this Court is aware it is possible that retrying the two cases – outcomes we find Missouri Supreme Court precedent dictates for the reasons discussed below and in Brian's case – may present evidentiary challenges for the State because it has been approximately thirty-two years since Victim's murder. Additionally, this Court agrees with the State to the extent it argues there was sufficient evidence from which a reasonable juror could have inferred *someone* deliberated before killing Victim because she was beaten to death and died after suffering multiple wounds and repeated blows. *See Glass*, 136 S.W.3d at 514 (deliberation may be inferred where a victim dies after suffering multiple wounds or repeated blows). Nevertheless, as will be discussed below and in

14

Brian's case, there is no such evidence in either of the cases before us from which a reasonable juror could have found or inferred Defendant or his brother personally committed Victim's murder or personally deliberated in her killing.[14] Because this Court is aware of no other person who was charged with Victim's murder, the result of our cases is that no one may be held accountable for first-degree murder for Victim's killing, though Defendant and/or his brother may be convicted of second-degree felony murder if a jury finds one or both of them guilty of the offense upon retrial.

Despite those concerns, this Court is bound to follow controlling decisions of the Missouri Supreme Court, which includes *O'Brien* and its progeny. *See Jones v. Galaxy 1 Marketing, Inc.*, 478 S.W.3d 556, 574 (Mo. App. E.D. 2015). Those cases are instructive in determining whether the State made a submissible case that Defendant committed first-degree murder on the basis of accomplice liability and specifically whether the State met its burden to show Defendant personally deliberated on Victim's death.

Here, a reasonable juror could have found or inferred from the relevant and admissible evidence discussed above in Section II.A.2. (including Victim's Granddaughter's testimony, the bite taken out of the cheese, and the DNA evidence relating to the cheese wrapper and the stocking) that: Defendant and/or his brother had a motive to break-in to Victim's house to obtain cash from the Calumet can; in the years prior to the 1984 break-in and murder, Brian was linked to Victim's home and Defendant was linked to Brian and Victim's Granddaughter; Victim was killed during the perpetration of the 1984 burglary of her home; Defendant and Brian lived close to Victim near the time the 1984 crime occurred; and DNA evidence linked Defendant and Brian to Victim's home or surrounding property near the time the 1984 crime occurred.

---

[14] Therefore, this case can be distinguished from the circumstances in *O'Brien*, where there was arguably evidence from which a reasonable juror could have found or inferred the defendant's accomplice (Blount) personally committed the victim's murder, including evidence that: Blount made a statement that he murdered the victim; Blount was seen with the victim in the area he was found barely alive; and Blount was wearing bloody shoes. *See O'Brien*, 857 S.W.2d at 216.

15

However, similar to the circumstances in *O'Brien*, there was no evidence in this case that Defendant and another person, including Brian, had an agreement to kill Victim, and there was no evidence Defendant personally caused Victim's death. *See O'Brien*, 857 S.W.2d at 216-19. In fact, the State's respondent's brief in this case concedes, "it is unclear from the evidence in [Defendant's] case whether [Defendant] or his brother personally committed the murder." Also like in *O'Brien*, no deadly weapon was used to kill Victim; instead, she was beaten to death. *See id.* at 218. Furthermore, none of the other "highly relevant" circumstances held to be properly attributable to a defendant tried for first-degree murder under a theory of accomplice liability are present in this case. Specifically, there was no evidence Defendant or Brian in Defendant's presence made a statement or exhibited conduct indicating an intent to kill Victim prior to her murder. *See Rousan*, 961 S.W.2d at 841; *Gray*, 887 S.W.2d at 376. Nor was there evidence Defendant participated in the killing.[15] *See Rousan*, 961 S.W.2d at 841; *Gray*, 887 S.W.2d at 377. Notably, the evidence in this case did not demonstrate at least two people participated in Victim's murder, as she was eighty-four years old and weighed less than one-hundred pounds, and the pathologist who performed Victim's autopsy testified he could not determine how many people had beaten Victim. Finally, there was no evidence Defendant continued with a criminal enterprise after it was apparent that Victim was to be killed. *See id.* Under these circumstances,

---

[15] In support of its argument that there was sufficient evidence Defendant participated in Victim's murder, the State cites to *State v. Freeman*, 269 S.W.3d 422 (Mo. banc 2008). In *Freeman*, the Missouri Supreme Court held there was sufficient evidence the defendant committed the crime of first-degree murder based on principal liability where, *inter alia*, the victim's body was found with one stocking on her leg and one stocking tied tightly around her neck; victim's cause of death was determined to be asphyxia; the defendant's DNA was found on both stockings touching the victim's person; and the defendant's DNA was found on toilet paper found underneath the victim's body. *Id.* at 423-26. *Freeman* can be distinguished from this case for several reasons, notwithstanding the fact that this case involves a conviction for first-degree murder based on accomplice liability rather than principal liability. Unlike the circumstances in *Freeman*, in this case there was no DNA evidence found in the room which Victim's body was found (in this case, the bedroom), let alone on any item touching or underneath the Victim's person, which linked Defendant or his brother to Victim's killing. Additionally, although there were multiple nylon stockings found in Victim's bedroom and Defendant's DNA was found on a nylon stocking found outside of Victim's house, there was no evidence in this case that any stocking caused or contributed to Victim's death. Accordingly, the State's reliance on *Freeman* is misplaced.

we cannot find there was sufficient evidence presented that Defendant personally deliberated on Victim's death. Moreover, such a finding would require us to supply missing evidence or give the State the benefit of unreasonable, speculative, or forced inferences, something which this Court may not do. *See Clark*, 490 S.W.3d at 707.

Finally, we address the State's argument that there was sufficient evidence of Defendant's deliberation because Victim was beaten to death and died after suffering multiple wounds and repeated blows. As we previously stated, we do find there is sufficient evidence from which a reasonable juror could have inferred *someone* deliberated before killing Victim because of the manner in which she was killed. *See Glass*, 136 S.W.3d at 514. Nevertheless, the State's argument that the manner in which Victim was killed supports a finding that *Defendant* deliberated has no merit under the circumstances of this case. As stated in *O'Brien*, "[w]here the defendant is simply an accessory and does not participate in the act of killing, any inferences which may be raised by the manner in which the victim was killed cannot serve to prove the defendant's premeditation." 857 S.W.2d at 219; *see also Glass*, 136 S.W.3d at 514 (finding an appellate court may permit an inference of deliberation where there is evidence a *defendant* committed a murder which required some time to complete because of the particular method of attack). Because there was no evidence Defendant participated in the act of killing Victim, the manner of her death cannot be used to support an inference that he deliberated. *O'Brien*, 857 S.W.2d at 219.

Based on the foregoing, there was not sufficient evidence from which a reasonable juror could have found or inferred that Defendant personally deliberated in Victim's killing, and therefore, we reverse Defendant's conviction for first-degree murder. *See id.* at 217-20.

### 6. Whether Remand or Other Action is Appropriate

We now turn to whether this case requires a remand for a new trial on second-degree felony murder or entry of a conviction for that offense. Again, we are guided by *O'Brien* in making this determination.

As previously stated, the defendant in *O'Brien* was charged with first-degree murder, the lesser-included offense of second-degree felony murder based on the death of the victim as a result of the defendant's perpetration of the felony of first-degree burglary, and first-degree burglary. *Id*. at 216-17, 220. The jury was given a verdict form as to each of those three offenses and found the defendant guilty of first-degree murder under a theory of accomplice liability and first-degree burglary. *Id*. at 216-17.

On appeal, the defendant's only challenge to the sufficiency of the evidence was with respect to his first-degree murder conviction. *Id*. at 215, 220. While the Supreme Court in *O'Brien* held there was insufficient evidence to support the defendant's first-degree murder conviction and reversed that conviction, the Court also held the evidence was sufficient to support the submission of second-degree felony murder based on the death of the victim as a result of the defendant's perpetration of a first-degree burglary. *Id*. at 220. The Court found it was not possible for it to enter a conviction for second-degree felony murder because the jury was not required to find all of the elements of the offense to find the defendant guilty of first-degree murder; specifically, the jury was not required to find that the victim's death occurred as a result of the commission of the defendant's perpetration of the first-degree burglary. *Id*. Nevertheless, the Missouri Supreme Court found it was proper to remand the case for a new trial on the charge of second-degree felony murder because there was sufficient evidence to support the submission of the offense, explicitly rejecting a claim made by the defendant that such a disposition would violate double jeopardy. *Id*. at 220-21.

18

Here, similar to the circumstances in *O'Brien*, the information in this case not only charged Defendant for first-degree murder but also gave Defendant notice that the State may submit an instruction for second-degree felony murder to the jury based on the death of Victim as a result of Defendant's perpetration of the felony of first-degree burglary. *See id*. at 216-17, 220. In addition, both of those charges were submitted to the jury, and the jury found Defendant guilty of first-degree murder under a theory of accomplice liability and did not reach the issue of whether Defendant was guilty of second-degree felony murder. *See id*.

A person commits second-degree felony murder if he, *inter alia*, "[c]ommits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony . . . another person is killed as a result of the perpetration or attempted perpetration of such felony . . .." Section 565.021.1(2). A person commits the class B felony of first-degree burglary if, *inter alia*, he knowingly enters unlawfully into a structure for the purpose of committing a crime therein and there is another person present who is not a participant in a crime. Sections 569.160.1(3) and .2 RSMo 1978 (effective 1-1-79).

Unlike with first-degree murder, a defendant may be charged and convicted as an accomplice to second-degree murder without a finding that the defendant had any culpable mental state other than an intent to promote the commission of the offense. 32 Mo. Practice Series section 12.3 (2d ed. 2016); *see also State v. Smith*, 229 S.W.3d 85, 95 (Mo. App. W.D. 2007).

> In other words, a defendant may be convicted of second degree murder as an aider and abettor without proof that the defendant specifically intended to kill the victim; rather, the proof must establish that the defendant had a common purpose to promote or further the commission of murder in the second degree by the accomplice.

32 Mo. Practice Series section 12.3 (2d ed. 2016).

Based on the relevant and admissible evidence set forth in Section II.A.2. above, we hold there was sufficient evidence from which a reasonable juror could have found, (1) Defendant

committed or attempted to commit the felony of first-degree burglary by knowingly entering unlawfully into Victim's home for the purpose of committing a crime therein and she was present and not a participant in the crime; and (2) Victim was killed as a result of Defendant's perpetration or attempted perpetration of the burglary. Because the evidence was sufficient to support the submission of second-degree felony murder based on the death of Victim as a result of Defendant's perpetration or attempted perpetration of a first-degree burglary, and because the jury in this case was not required to find that Victim's death occurred as a result of the commission of a first-degree burglary, we remand the case for a new trial on the charge of second-degree felony murder.[16] *See O'Brien*, 857 S.W.2d at 220-21.

### 7.    Conclusion as to Defendant's First Point on Appeal

Based on the foregoing, Defendant's conviction for first-degree murder is reversed and the cause is remanded for a new trial for second-degree felony murder. Point one is granted.

### B.    The Trial Court's Evidentiary Rulings

We now turn to Defendant's remaining points on appeal, in which he argues the trial court erred in making various evidentiary rulings. In Defendant's second point on appeal, he contends the trial court erred in admitting evidence relating to the 1980 burglary. In Defendant's third and fourth points on appeal, he asserts the trial court erred in admitting the cheese wrapper and the stocking into evidence. In Defendant's fifth point on appeal, he maintains the trial court erred in admitting some of the exhibits and testimony from Fahnestock pertaining to DNA

---

[16] We recognize that unlike in this case, the defendant in *O'Brien* was charged with first-degree burglary, the jury was given a verdict form on first-degree burglary, and the jury subsequently found him guilty of that offense. *O'Brien*, 857 S.W.2d at 216-17. The fact that none of those circumstances were present in this case does not change the applicability of *O'Brien*'s holding that when an appellate court reverses a first-degree murder conviction for insufficient evidence, it is proper to remand the case for a new trial on a charge of second-degree felony murder where there was sufficient evidence to support the submission of the offense. This is because: "The State is not required to successfully convict a defendant of an underlying felony as a prerequisite to a conviction for felony murder. To the contrary, an underlying felony to support felony murder need not even be charged." *State v. Blair*, 443 S.W.3d 677, 686 (Mo. App. W.D. 2014) (emphasis omitted); *see also Blurton*, 484 S.W.3d at 767-68 (indicating that it is not necessary for a jury to be instructed to decide a defendant's guilt of the felony underlying a second-degree felony murder charge).

20

testing on the cheese wrapper.  Finally, Defendant's sixth and seventh points on appeal relate to the exclusion and admission of evidence pertaining to whether Victim's Granddaughter and Defendant's brother Brian were still dating at the time of the 1980 burglary of Victim's home. We consider the merits of these points to the extent they involve matters which may arise on retrial.  *See id*. at 221 (similarly finding).

### 1. Admission of Evidence Relating to the 1980 Burglary

In Defendant's second point on appeal, he contends the trial court erred in admitting evidence relating to the 1980 burglary because it was improper evidence of a prior uncharged crime involving his brother and alleged accomplice.  It is undisputed the only crime Defendant was charged with committing in this case was Victim's 1984 murder – first-degree murder and an alternative charge of second-degree felony murder based on the death of Victim as a result of Defendant's perpetration of felony first-degree burglary in 1984.  We consider the merits of Defendant's claim that the trial court erred in admitting evidence relating to the 1980 burglary because it involves a matter which may arise on retrial.  *See id*.

#### a. Standard of Review

It is within a trial court's broad discretion to admit or exclude evidence at trial and an evidentiary ruling is reviewed for an abuse of discretion.  *State v. Hood*, 451 S.W.3d 758, 765 (Mo. App. E.D. 2014).  A trial court abuses its discretion when its decision "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id*.  We will only reverse an evidentiary error if prejudice is demonstrated, i.e., if there is a reasonable probability the trial court's alleged error affected the outcome of the trial.  *Id*.

#### b. Evidence Relating to the 1980 Burglary Which was Adduced at Trial

Over Defendant's continuing objection, Officer Simpson, who was present at the crime scene after the 1980 burglary of Victim's home and after the 1984 break-in of Victim's home

and her murder, was allowed to testify about the similarities between the two crimes[17] and the following details of the 1980 burglary.

In March of 1980, Victim's house was broken into while she was in the hospital. Police searched the premises and conducted an investigation which revealed the following. A person or persons gained entry into Victim's home through a basement window located in the back of the home. Three of the lower kitchen cabinets next to Victim's refrigerator were open, but the other kitchen cabinets and all drawers remained closed. Two opened 7UP bottles were sitting on the dining room table next to an open bag of chips, and a flashlight owned by Victim was near the center of the table. In the bedroom, the covers on Victim's bed had been slightly pulled back on one side, and about three items were lying on the floor near the bed. With respect to the two bedroom dressers, multiple drawers were opened on both dressers, it was not evident that any of the drawers on either dresser had been rummaged through extensively, and neither dresser top was disturbed. Police classified the break-in of Victim's home as a burglary and suspected more than one person was involved because the two soda bottles were opened and left at two different places on the dining room table. Around the time the crime occurred, police officers lifted a latent fingerprint from the refrigerator door handle; however, it went unidentified until 1986, when officers determined the fingerprint belonged to Defendant's brother Brian. Nevertheless, Brian was not a suspect in the 1980 burglary near the time it occurred and he was never charged in connection with the crime. In addition, Defendant was not ever a suspect in or charged with the 1980 burglary. Sometime after the 1980 burglary, Victim had bars installed on the basement windows of her home. During the State's closing argument in Defendant's case, the prosecutor argued that Brian's alleged involvement in the 1980 burglary was evidence of Defendant's guilt in the 1984 murder and related break-in.

---

[17] Evidence of similarities and differences between the 1980 burglary and the 1984 murder and related break-in will be discussed below in Sections II.B.1.f.i. and II.B.1.f.ii.

### c. Relevant Law

"A criminal defendant has the right to be tried only for the offense for which he is charged," without having his guilt prejudged by another's act or admission. *State v. Austin*, 411 S.W.3d 284, 293 (Mo. App. E.D. 2013) (quoting *State v. Blakey*, 203 S.W.3d 806, 811 (Mo. App. S.D. 2006)); *State v. White*, 952 S.W.2d 802, 805 (Mo. App. E.D. 1997). Accordingly, evidence of an uncharged crime is inadmissible if it is offered for the sole purpose of showing the defendant's propensity to commit the crime for which he is charged. *State v. Miller*, 372 S.W.3d 455, 473 (Mo. banc 2012); *Austin*, 411 S.W.3d at 293-94. Similarly, evidence which has no purpose other than to attempt to convince the jury of the defendant's guilt because of his association with another person is inadmissible. *State v. Beck*, 673 S.W.2d 122, 125 (Mo. App. E.D. 1984). However, evidence of an uncharged crime is admissible if it is both logically and legally relevant. *Austin*, 411 S.W.3d at 294.

Evidence is considered to be logically relevant if it has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. *Id*. There are several generally-recognized exceptions which may make evidence of an uncharged crime logically relevant. *State v. Jackson*, 228 S.W.3d 603, 606 (Mo. App. W.D. 2007). These exceptions include when evidence tends to establish, (1) motive; (2) intent; (3) the identity of the person charged; (4) the absence of mistake or accident; (5) a common scheme or plan; or (6) a complete and coherent picture of the sequence of events surrounding the offense charged. *Id*.; *Austin*, 411 S.W.3d at 294. Even if the evidence of an uncharged crime does not fall within one of the previously-mentioned exceptions, it may still be admissible if it is somehow otherwise logically relevant and if it is legally relevant. *Jackson*, 228 S.W.3d at 606.

Evidence is considered to be legally relevant if its probative value outweighs its prejudicial effect. *Austin*, 411 S.W.3d at 294. The admission of evidence of an uncharged crime runs a risk of encouraging the jury to convict the defendant because of his propensity to commit

23

the crime for which he is charged. *State v. Nelson*, 178 S.W.3d 638, 642 (Mo. App. E.D. 2005). Evidence of other crimes – including those allegedly committed by an accomplice – is considered to be highly prejudicial. *See Zafiro v. U.S.*, 506 U.S. 534, 539 (1993); *Nelson*, 178 S.W.3d at 642. Therefore, "evidence of other crimes should be utilized only when there is strict necessity." *Nelson*, 178 S.W.3d at 642 (quoting *State v. Helm*, 892 S.W.2d 743, 745 (Mo. App. E.D. 1994)); *see also Middleton v. State*, 80 S.W.3d 799, 808 (Mo. banc 2002); *State v. Collins*, 669 S.W.2d 933, 936 (Mo. banc 1984) (superseded on other grounds). Although generally the balancing of the effect and value of evidence lies within the sound discretion of the trial court, an appellate court "should require that the admission of evidence of other crimes be subjected to rigid scrutiny because such evidence could raise a legally spurious presumption of guilt in the minds of the jurors." *State v. Davis*, 211 S.W.3d 86, 88 (Mo. banc 2006) (quoting *State v. Sladek*, 835 S.W.2d 308, 311 (Mo. banc 1992)) (internal quotations omitted).

In this case, the State argues evidence relating to Defendant's brother's alleged involvement in the 1980 burglary is logically relevant because it tends to establish Defendant's motive, intent, and identity for the 1984 murder and related break-in. The State further argues the 1980 burglary evidence is legally relevant because its probative value in tending to establish Defendant's alleged motive, intent, and identity outweighs its prejudicial effect.

At this juncture, it is important to note neither party has provided this Court with any authority providing that the motive, intent, or identity exceptions may allow the State to introduce evidence relating to an uncharged crime allegedly committed by a defendant's accomplice. Moreover, we have been unable to find any such authority. We assume, for purposes of this appeal only, that the motive, intent, and identity exceptions may allow the State to introduce evidence relating to an uncharged crime allegedly committed by a defendant's accomplice only if the evidence is both logically and legally relevant. *See Austin*, 411 S.W.3d at 294.

###### d.    Motive

The State argues the evidence relating to the 1980 burglary tends to establish Defendant had a motive for the 1984 murder and related break-in because the person committing the 1980 burglary "was apparently looking for the same item (the Calumet can containing money) in the lower kitchen cabinets as the person committing the 1984 break-in."

Even assuming *arguendo* that the evidence relating to the 1980 burglary could be considered logically relevant to show Defendant's motive for the 1984 murder and related break-in, the evidence relating to the 1980 burglary was only admissible under the motive exception if the evidence was also legally relevant. *See Austin*, 411 S.W.3d at 294. Although Defendant's potential knowledge (from association with his brother) that Victim had a Calumet can containing money in her home had some probative value, the probative value of the evidence relating to the 1980 burglary was exceeded by the potential prejudicial effect of raising a presumption in the minds of the jurors that Defendant was guilty of the 1984 crime. *See Davis*, 211 S.W.3d at 88. Additionally, there was not a strict necessity to admit evidence relating to the 1980 burglary to establish that an alleged motive for the 1984 crime was a search for the Calumet can because other evidence adduced at trial sufficiently established such an alleged motive. Specifically, Victim's Granddaughter testified that when she and Defendant's brother Brian were dating in 1979, he became aware Victim kept extra cash in the Calumet can located in the lower kitchen cabinets next to her refrigerator, because Brian saw Granddaughter steal money from the Calumet can when Victim was not looking. Accordingly, we find the prejudicial effect of the evidence relating to the 1980 burglary outweighs any alleged probative value of and necessity for the evidence to show motive, and therefore, it was not legally relevant for that purpose. *See Collins*, 669 S.W.2d at 936 and *State v. Garrett*, 825 S.W.2d 954, 958 (Mo. App. E.D. 1992) (similarly holding); *see also Austin*, 411 S.W.3d at 294. Therefore, the evidence was inadmissible under the motive exception. *See Austin*, 411 S.W.3d at 294.

### e. Intent

Next, we address whether evidence relating to the 1980 burglary is admissible because it tends to establish Defendant's intent for the 1984 murder and related break-in.

In a murder or assault case, a defendant's or his accomplice's prior misconduct toward the victim, especially a similar level and type of abuse, may be logically relevant to show a defendant's intent. *See State v. Howery*, 427 S.W.3d 236, 252 (Mo. App. E.D. 2014); *State v. Chism*, 252 S.W.3d 178, 185 (Mo. App. W.D. 2008). However, such evidence is legally relevant and necessary to establish a defendant's intent only if the defendant puts his intent at issue in the case. *See id.*; *see also State v. Conley*, 873 S.W.2d 233, 237 (Mo. banc 1994). A defendant puts intent at issue in the case only if he admits to the charged act but claims it was committed innocently or by mistake in that it was done in self-defense, by consent, or by accident. *Howery*, 427 S.W.3d at 252; *Chism*, 252 S.W.3d at 185. In contrast, a defendant's denial of a charged act does not make intent an issue. *Howery*, 427 S.W.3d at 252. If a defendant does not put intent at issue in a case, the prejudicial effect of the evidence of prior misconduct outweighs any probative value, and the evidence is not legally relevant or admissible for the purpose of establishing the defendant's intent. *Howery*, 427 S.W.3d at 252; *Chism*, 252 S.W.3d at 185.

Even assuming *arguendo* that the 1980 burglary, which was committed when Victim was not home, could be considered prior misconduct toward Victim and logically relevant to show Defendant's intent for the 1984 murder and related break-in, the evidence relating to the 1980 burglary was only admissible under the intent exception if Defendant put his intent at issue and the evidence was legally relevant. *See id.*; *Austin*, 411 S.W.3d at 294. In this case, Defendant did not put his intent at issue because, (1) he did not admit to breaking into Victim's home in 1984 or to causing her death; and (2) he did not claim the charged acts were committed innocently or by mistake in that they were done in self-defense, by consent, or by accident. *See Howery*, 427 S.W.3d at 252; *Chism*, 252 S.W.3d at 185. Accordingly, the prejudicial effect of

26

the evidence relating to the 1980 burglary outweighs any alleged probative value and necessity for the evidence to show Defendant's intent for the 1984 murder and related break-in, and therefore, it was not legally relevant for that purpose. *See id.*; *see also Conley*, 873 S.W.2d at 237. Consequently, the evidence relating to the 1980 burglary was inadmissible under the intent exception. *See Howery*, 427 S.W.3d at 252; *Chism*, 252 S.W.3d at 185; *see also Austin*, 411 S.W.3d at 294.

### f. Identity

We now turn to whether evidence relating to the 1980 burglary is logically relevant because it tends to identify Defendant as the person who committed the 1984 murder and related break-in.

Evidence is logically relevant under the identity exception[18] if the identity of the wrongdoer is at issue, and the State demonstrates the defendant is the perpetrator who has committed the charged crime by showing defendant or his accomplice has committed other uncharged acts which are sufficiently similar to the crime charged with respect to time, place, and method. *See State v. Bernard*, 849 S.W.2d 10, 17 (Mo. banc 1993) (partially superseded on other grounds).

> For the prior conduct to fall within the identity exception, there must be more than mere similarity between the crime charged and the uncharged crime. The charged and uncharged crimes must be nearly 'identical' and their methodology 'so unusual and distinctive' that they resemble a 'signature' of the defendant's [or his accomplice's] involvement in both crimes.

*See id.*; *see also State v. Bowman*, 337 S.W.3d 679, 686 (Mo. banc 2011); *Davis*, 211 S.W.3d at

---

[18] The State refers to this exception as the "identity exception," and Defendant refers to it as both the "identity exception" and the "*modus operandi* exception." The Missouri Supreme Court has used both of these terms and in differing ways. *State v. Henderson*, 105 S.W.3d 491, 496 (Mo. App. W.D. 2003). Regardless of what the exception is called or what it may resemble, the standard the Missouri Supreme Court has adopted to determining whether evidence is admissible is the same and is the one we use below in this case. *See id.* (similarly finding); *compare State v. Bowman*, 337 S.W.3d 679, 686-87 (Mo. banc 2011), *with Davis*, 211 S.W.3d at 88-89, *and State v. Bernard*, 849 S.W.2d 10, 17 (Mo. banc 1993) (partially superseded on other grounds). For purposes of this appeal, we will refer to this exception as the "identity exception."

89. The bar for establishing that an uncharged crime falls within this exception is high. *Bowman*, 337 S.W.3d at 686.

### i. Similarities Between the 1980 and 1984 Crimes

In this case, Officer Simpson testified there were multiple similarities between the 1980 and 1984 crimes. First, he testified that the 1980 and 1984 crimes were similar because in both instances, the perpetrator(s) entered Victim's home through glass windows; in 1980, entry was gained through a basement window located in the back of the home, and in 1984, entry was gained through the window on the front door. Second, a flashlight found on the dining room table in 1980 was the same flashlight found outside near the back of Victim's property in 1984. There was also evidence presented at trial that Victim usually kept the flashlight on the top of shelves built into the headboard of her bed, suggesting the flashlight was moved from the bedroom in both crimes.

Third, there were a few minor similarities with respect to the state of the kitchen, bedroom, and living room after both crimes. In the kitchen, some of the same lower kitchen cabinets – three below the counter near the refrigerator – had been left opened in both the 1980 and 1984 crimes, and the kitchen cabinets above the counter remained closed in both incidents. In the bedroom, some of the same drawers on the two dressers were opened in both incidents. In addition, the living room was undisturbed in both crimes.

Fourth, in both the 1980 and 1984 crimes, police suspected more than one person was involved; police thought that in 1980 because two soda bottles were opened and left at two different places on the dining room table, and in 1984, police found two knives in the kitchen and evidence of two pairs of gloves in the kitchen and outside of Victim's property. And finally, in both crimes, the evidence demonstrated the perpetrator(s) consumed food at the crime scenes and took some food items from the refrigerator. In 1980, police found two opened 7UP bottles and an open bag of potato chips sitting on the dining room table, and police lifted a latent

fingerprint from the refrigerator door handle. In 1984, the refrigerator door and crisper drawer were open, and lying on the floor in front of the refrigerator were a large plastic bag containing some grapefruit, a frozen meal, a Tupperware container, a piece of cheese with a bite mark taken out of it, and an empty single-serve cheese wrapper.

### ii. Further Testimony from Officer Simpson and Differences Between the 1980 and 1984 Crimes

Officer Simpson testified he considered the 1980 burglary and the 1984 crimes to be "strikingly similar." However, further testimony from Officer Simpson and other evidence adduced at trial also revealed there were several differences between the 1980 and 1984 crimes, notwithstanding the fact that no one was present in the house or hurt in 1980 whereas Victim was murdered there in 1984.

First, the points of entry were on different sides of the house in 1980 (the back) and 1984 (the front), although Victim did have bars installed on the basement windows sometime after the 1980 burglary. Second, the flashlight which was apparently moved from the bedroom in both crimes was found in different locations; in 1980, it was found on the dining room table, whereas in 1984 it was found outside near the back of Victim's property.

One of most notable differences between the two crimes is there was generally more ransacking and more areas of the home disturbed in 1984 than in 1980. In 1980, the only areas of the home disturbed were: the basement only to the extent that was the area the perpetrator(s) entered the home; the kitchen only to the extent that three lower kitchen cabinets were opened and a fingerprint was found on the refrigerator door; and the bedroom only to the extent that the covers on Victim's bed had been slightly moved, there were about three items lying on the floor, and multiple drawers were opened on both dressers.

In stark contrast, in the 1984 crime, Victim's basement, kitchen, bedroom, and hallway had been ransacked, and several drawers, cabinets, and items were opened throughout the house.

In 1984 only, lock boxes had been dumped on the basement floor and personal papers were spread across the floor. In the kitchen, one lower cabinet and two drawers next to Victim's refrigerator were found open in 1984 that were not found open in 1980. In addition, in 1984 only, various items were dumped out on the kitchen countertop; the bread box and multiple containers were open; gloves were found on the kitchen floor; the refrigerator door and crisper drawer were open; and food was lying on the kitchen floor. In the bedroom, unlike in 1980, in 1984: some of the bedding was rolled up toward the head of the bed; an extensive amount of clothes and papers and some bedding was on the floor; two kitchen-type knives and lock boxes were found on the floor; the bedroom closet was open and appeared to be ransacked; the two bedroom dressers each had at least one drawer rummaged through extensively; and the tops of both dressers were in disarray. Finally, in 1984 only, doors on two cabinets were opened and items were dumped on the floor in the hallway, and one cabinet had a drawer which was open and another cabinet had a door which was open in the dining room.

Additionally, although food was consumed during the 1980 and 1984 incidents, the consumed food in each incident was different in substance and quantity and was found in different rooms of the home. Specifically, in 1980, two open 7UP bottles and open bag of potato chips were found on the dining room table, whereas in 1984 a piece of cheese with a bite taken out of it was found on the kitchen floor.

### iii. Analysis

In light of all of the several and significant differences between the 1980 and 1984 crimes, we cannot find the crimes were nearly identical or that the methodology used to commit each crime was so unusual and distinctive to establish any kind of signature. The fact that there were multiple similarities between the two crimes does not change this result. *See Bernard*, 849 S.W.2d at 17 ("[f]or the prior conduct to fall within the identity exception, there must be more than mere similarity between the crime charged and the uncharged crime"); *see also Davis*, 211

30

S.W.3d at 87-89 (holding uncharged robbery was not sufficiently similar to be admissible under the identity exception in case involving charged robbery because although the two crimes had multiple similarities, they were different in several respects).

Here, although there was entry through glass in the 1980 and 1984 crimes, the entry was not nearly identical nor was it a methodology so unusual and distinctive to resemble a signature because the points of entry were different in both crimes. Similarly, although there was evidence indicating Victim's flashlight was moved from her bedroom in both crimes, it was found by police in different locations (inside the home in 1980 and outside the home in 1984), and therefore, this factor also does not render the crimes sufficiently similar to meet the identity exception. Further, we find the disturbance to some of the same kitchen cabinets and bedroom drawers and the lack of disturbance to the living room in both crimes does not make the two crimes sufficiently similar under the identity exception because the kitchen, bedroom, and other areas of the home were much more disturbed and ransacked in 1984. With respect to Officer Simpson's testimony that police suspected more than one person was involved in both the 1980 and 1984 crimes, we find the suspicion was not nearly identical nor was it a methodology so unusual and distinctive to resemble a signature because in each instance the suspicion was caused by different items, found in different locations. Specifically, it was suspected two perpetrators committed the 1980 crime because two soda bottles opened and found in the dining room, whereas it was suspected two persons committed the 1984 murder and related break-in because two knives were found in the bedroom and evidence of two pairs of gloves was found in the kitchen and outside of Victim's property.

Finally, while the perpetrator(s) consumed food at the crime scenes and appeared to take items from the refrigerator in both crimes, multiple Missouri cases indicate that it is not completely uncommon for perpetrators to consume or move food while burglarizing a house. *See e.g. State v. Agee*, 350 S.W.3d 83, 86 (Mo. App. S.D. 2011) (homeowner arrived home to

31

find burglars eating food from his refrigerator); *State v. Parsons*, 152 S.W.3d 898, 900 (Mo. App. W.D. 2005) (officers conducting investigation of a home suspected a burglary and found food scattered throughout the house); *State v. Childress*, 901 S.W.2d 321, 321-22 (Mo. App. E.D. 1995) (defendant broke into house and ate bread and cookies) (overruled on other grounds).[19] Additionally, the consumed food in each incident at issue in this case was different in substance and quantity and was found in different rooms of the home. Therefore, we cannot find the crimes were either nearly identical or that the methodology in both crimes was so unusual and distinctive to resemble a signature based upon the consumption of food and taking of items from the refrigerator in both crimes.

Under the circumstances of this case, we hold the evidence relating to the 1980 burglary is not sufficiently similar as to tend to identify Defendant as the person who committed the 1984 murder and related break-in. Accordingly, we hold the 1980 burglary evidence does not have a legitimate tendency to directly establish Defendant's guilt for the 1984 crime, and therefore, is not logically relevant under the identity exception. *See Austin*, 411 S.W.3d at 294.

We also hold the evidence relating to the 1980 burglary is not legally relevant under the identity exception. Any alleged probative value of the evidence was diminished because the two incidents were neither nearly identical nor sufficiently unusual and distinctive to establish any kind of signature, and because the two incidents occurred over four years apart. In addition, any probative value of the 1980 burglary evidence was exceeded by the potential prejudicial effect of raising a presumption in the minds of the jurors that Defendant was guilty of the 1984 crime. *See Davis*, 211 S.W.3d at 88. Moreover, there was not a strict necessity to admit evidence relating to the 1980 burglary in order to identify Defendant as a person involved in the 1984

---

[19] *See also State v. Ellifrits*, 459 S.W.2d 293, 294-95 (Mo. banc 1970) (neighbors of homeowners who were burglarized discovered home was ransacked, dirty dishes were in the sink, and food was left on the table); *State v. Figgins*, 839 S.W.2d 630, 631, 634 (Mo. App. W.D. 1992) (police suspected defendant took bites of hot dog at scene of burglary and murder).

murder and related break-in, where, *inter alia*, the 2011 DNA testing of the stocking linked him to the 1984 crime, the 2011 DNA testing of the cheese wrapper linked his brother Brian to the crime, and Victim's Granddaughter's testimony established Brian had previously been at Victim's home and she met Defendant around the time she and Brian were dating.

Based on the foregoing, the evidence relating to the 1980 burglary was neither logically nor legally relevant to identify Defendant as a person involved in the 1984 murder and related break-in. Therefore, the evidence of the uncharged 1980 crime was inadmissible under the identity exception. *See Austin*, 411 S.W.3d at 294.

### g. Conclusion as to Defendant's Second Point on Appeal

Because the State only relies on the motive, intent, and identity exceptions and we cannot find the evidence relating to the 1980 burglary evidence falls within some other exception or is somehow otherwise logically and legally relevant, we hold the trial court abused its discretion in admitting evidence relating to the 1980 burglary. Moreover, because we have already held in our discussion of Defendant's first point on appeal that this cause needs to be reversed for a new trial due to there being insufficient evidence to support Defendant's conviction for first-degree murder, it is unnecessary for us to discuss whether there is a reasonable probability the trial court's erroneous admission of evidence relating to the 1980 burglary affected the outcome of his trial at issue in this case. Point two is granted.

### 2. Admission of the Cheese Wrapper and Stocking

In Defendant's third and fourth points on appeal, he asserts the trial court erred in admitting the cheese wrapper (Exhibit 58) and the stocking (Exhibit 53) into evidence because the State did not establish a sufficient chain of custody for the exhibits. We consider the merits of these claims because they involve matters which may arise on retrial. *See O'Brien*, 857 S.W.2d at 221.

33

### a. General Law and Standard of Review

In order for a trial court to properly receive an exhibit and testimony regarding tests performed on the exhibit as evidence at trial, the State must establish the identity of the exhibit and that it was in the same condition when tested as when it was originally seized. *State v. Spears*, 452 S.W.3d 185, 196 (Mo. App. E.D. 2014); *State v. Dawson*, 985 S.W.2d 941, 953 (Mo. App. W.D. 1999). The State may meet this burden by establishing a sufficient chain of custody. *State v. Pennell*, 399 S.W.3d 81, 90 (Mo. App. E.D. 2013).

"The determination of whether a sufficient chain of custody has been established for the admission of an exhibit is a matter within the sound discretion of the trial court." *Id*. A trial court abuses its discretion when its decision "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Hood*, 451 S.W.3d at 765.

The chain of custody for an exhibit is considered to be sufficient where the State provides evidence showing "reasonable assurance that the exhibit offered is the same evidence seized and is in substantially the same condition as when seized." *State v. Davenport*, 924 S.W.2d 6, 9 (Mo. App. E.D. 1996). The purpose of this rule is to prevent an exhibit from being altered, substituted, or tampered with – all issues which the trial court is in the best position to determine. *State v. Russ*, 537 S.W.2d 216, 219 (Mo. App. 1976); *see State v. Nettles*, 216 S.W.3d 162, 166 (Mo. App. S.D. 2006).

The "reasonable assurance" standard "does not require proof of hand-to-hand custody, a showing that the exhibit was continually watched, or proof of the exclusion of every possibility that the evidence has been disturbed." *State v. Sammons*, 93 S.W.3d 808, 810 (Mo. App. E.D. 2002). Moreover, the trial court may assume, absent a showing of bad faith or tampering, that the officials charged with having custody of an exhibit properly discharged their duties and that no tampering of the evidence occurred. *Spears*, 452 S.W.3d at 197.

34

### b.       The Cheese Wrapper

We first consider Defendant's third point on appeal, which involves whether the State established a sufficient chain of custody for the admission of the cheese wrapper.

### i.       Evidence Adduced at Trial

The following evidence relating to the chain of custody of the cheese wrapper was adduced at trial.  Officer John Young, the first officer to respond to Victim's house on the day she was found murdered (November 4, 1984), saw a single-slice cheese wrapper lying on the floor in front of the refrigerator.  Later that same day, Officer Simpson arrived at Victim's house and saw a single-slice cheese wrapper lying on the floor in front of the refrigerator.  Officer Simpson saw Detective Robert Brockmeyer, who was in charge of processing the scene of Victim's murder, pick up the cheese wrapper and put it in an evidence envelope, which he signed.  Detective Brockmeyer was deceased by the time of Defendant's trial, and therefore, he was not available to testify; however, other officers testified as to the following.

Officer Simpson testified that neither he nor Detective Brockmeyer processed the cheese wrapper for fingerprints at the scene.  Instead, Officer Simpson testified that, to the best of his knowledge, after Detective Brockmeyer seized the cheese wrapper, Detective Brockmeyer processed the wrapper for fingerprints back at the police station's secured ballistics room.  The ballistics room was used for processing and dusting items for fingerprints before depositing those items into evidence.  In November 1984, only Officer Simpson, Detective Brockmeyer, and their commander had access to the ballistics room.

During that same timeframe, evidence could be deposited with the St. Charles City Police Department's evidence officer either by hand or via a secured locker system.  When an officer seizing an item of evidence would process it for fingerprints in the ballistics room before turning it over to the evidence officer, an item could take several days to process before it was taken to

35

the evidence officer, and it was not unusual for that to happen. After the evidence officer was given evidence, it was maintained in a locked evidence area.

Officer Herbert Morie, the evidence officer, testified that Detective Brockmeyer gave him the evidence envelope containing the cheese wrapper by hand on November 14, 1984. An evidence receipt for the cheese wrapper which contained the signatures of Detective Brockmeyer and Officer Morie also showed the evidence envelope containing the cheese wrapper was received by Officer Morie on November 14, 1984.

When the cheese wrapper was seized by Detective Brockmeyer and put into the evidence envelope, the wrapper did not have fingerprint powder on it. However, the cheese wrapper did have fingerprint powder on it when it was taken to the St. Charles County Sherriff's Department for DNA testing in 2011 and when it was offered into evidence at trial. Nevertheless, Officer Simpson testified that the cheese wrapper admitted into evidence at trial was, to the best of his recollection, the same cheese wrapper which was seized by Detective Brockmeyer at Victim's home. In addition, the DNA expert who analyzed the cheese wrapper for DNA (Fahnestock) testified that, based on a paper from the November 2005 Journal of Forensic Science which conducted a series of experiments, fingerprint powder on an item does not cause a secondary transfer of DNA, indicating fingerprint powder on the cheese wrapper would not have affected the subsequent DNA testing. DNA testing performed on the cheese wrapper in 2011 revealed the presence of single-source DNA on the wrapper which was consistent with Defendant's brother Brian's DNA, and the probability of someone else in the general Caucasian population having the same DNA profile was 1 in 741,000.

### ii. Defendant's Arguments and Analysis

Defendant first argues the State failed to provide a reasonable assurance that the cheese wrapper was in substantially the same condition when tested and admitted into evidence as it was when it was originally seized because the wrapper was collected from Victim's house on

November 4, 1984, but it was not received by the evidence officer until November 14, 1984. Defendant also contends the State provided no testimony regarding what happened to the wrapper during that ten-day period.

However, the State did provide testimony explaining what happened to the cheese wrapper between November 4th and 14th.[20] Specifically, Officer Simpson testified that after he saw Detective Brockmeyer seize the cheese wrapper, neither of those officers processed the wrapper for fingerprints at the scene. Instead, Officer Simpson testified that, to the best of his knowledge, after Detective Brockmeyer seized the cheese wrapper, Detective Brockmeyer processed the wrapper for fingerprints back at the police station's secured ballistics room, a room to which only Officer Simpson, Detective Brockmeyer, and their commander had access. There was also testimony that when an officer seizing an item of evidence would process it for fingerprints in the ballistics room before turning it over to the evidence officer, an item could take several days to process before it was taken to the evidence officer, and it was not unusual for that to happen. Defendant argues the preceding testimony was insufficient to provide a sufficient chain of custody because the testimony was from crime scene investigator Officer Simpson and Officer Morie, who was the evidence officer, rather than from Detective

---

[20] Because the State provided testimony explaining what happened to the cheese wrapper between November 4th and 14th, this case can be distinguished from *State v. Bode*, 125 S.W.3d 924 (Mo. App. W.D. 2004) and *State v. Weber*, 768 S.W.2d 645 (Mo. App. S.D. 1989), two cases relied on by Defendant in this point. In *Bode*, the Western District held the State did not establish a sufficient chain of custody for a lab report offered into evidence where, *inter alia*, there was no testimony as to what happened to the tested items after they were seized. 125 S.W.3d at 929-30. In *Weber*, the Southern District held the State did not establish a sufficient chain of custody for items offered into evidence where, *inter alia*, there was no clear evidence in the record as to what the officer who collected the evidence did with the items after they were seized. 768 S.W.2d at 647-48.

Brockmeyer who actually seized the evidence.[21] We disagree. While the lack of testimony from Detective Brockmeyer could be considered an alleged weakness or gap in the chain of custody which could be a proper subject of cross-examination, any weakness or gaps in the chain of custody do not render evidence inadmissible but instead are only factual issues for the jury to consider in assessing the weight of the evidence. *See Pennell*, 399 S.W.3d at 91; *State v. Patterson*, 824 S.W.2d 117, 121 (Mo. App. E.D. 1992); *State v. Reed*, 811 S.W.2d 50, 55 (Mo. App. S.D. 1991).

Defendant also argues the State failed to provide a reasonable assurance that the cheese wrapper was in substantially the same condition when tested and admitted into evidence as it was when it was originally seized because when the wrapper was tested and admitted into evidence, it contained fingerprint powder which was not present on the wrapper when it was seized at the crime scene. Any discrepancies between the condition of an exhibit when it was originally seized and when it was tested at the lab and admitted into evidence do not render evidence inadmissible but instead are considered to be a proper subject of cross-examination and raise factual issues for the jury to consider in assessing the weight of the evidence. *See id*. Despite the fingerprint powder on the cheese wrapper, Officer Simpson testified that the cheese wrapper admitted into evidence at trial was, to the best of his recollection, the same cheese wrapper which was seized by Detective Brockmeyer at Victim's home. In addition, Fahnestock testified that,

---

[21] Defendant also argues the testimony from Officer Simpson and Officer Morie was insufficient to provide a sufficient chain of custody because Officer Simpson stated his testimony that the cheese wrapper was processed for fingerprints was consistent with that set out in Detective Brockmeyer's report. Defendant maintains that any testimony by Officer Simpson as to what Detective Brockmeyer said he did with the cheese wrapper, as written in his report, was hearsay. To the extent such testimony may have been hearsay, we find any error in its admission was harmless and did not cause the chain of custody for the cheese wrapper to be insufficient. This is because the alleged hearsay testimony was merely cumulative to other clearly admissible evidence adduced at trial, including testimony from Officer Simpson based on his personal recollection and the best of his knowledge, indicating that Detective Brockmeyer processed the cheese wrapper for fingerprints. *See State v. Cole*, 483 S.W.3d 470, 475-76 (Mo. App. E.D. 2016) (finding admission of hearsay statements was harmless where, *inter alia*, it was merely cumulative to other evidence); *State v. Martin*, 291 S.W.3d 269, 288-89 (Mo. App. S.D. 2009) (finding witness's alleged hearsay testimony was harmless error where, *inter alia*, it was cumulative to her own clearly admissible testimony).

based on a paper from the November 2005 Journal of Forensic Science which conducted a series of experiments, fingerprint powder on an item does not cause a secondary transfer of DNA, indicating fingerprint powder on the cheese wrapper would not have affected the subsequent DNA testing. We find this testimony provided a reasonable assurance that the cheese wrapper was in substantially the same condition when tested and admitted into evidence as it was when it was originally seized, and the fingerprint powder did not affect the reliability of the DNA testing on the wrapper. We also find that any evidence or inferences to the contrary were factual issues for the jury to consider in assessing the weight to be given to the cheese wrapper. *See Patterson*, 824 S.W.2d at 121 (similarly finding).

Based on the foregoing, we hold the State established a sufficient chain of custody for the cheese wrapper, and the trial court did not abuse its discretion in admitting the wrapper into evidence. Point three is denied.

### c. The Stocking

We now turn to Defendant's fourth point on appeal, which involves whether the State established a sufficient chain of custody for the admission of the stocking.

### i. Evidence Adduced at Trial

The following evidence relating to the chain of custody of the stocking was adduced at trial. Officer Ron Bextermueller testified he was one of the officers who was dispatched to Victim's house on the day she was found murdered (November 4, 1984) and he remained outside the house. While Officer Bextermueller was near the back of Victim's property by an alley, he saw a stocking lying on the ground. Officer Bextermueller testified he watched over the stocking to make sure no one tampered with it until it was seized into evidence. He further testified he saw Detective Brockmeyer seize the stocking and put it into its own evidence envelope. The evidence envelope containing the stocking, which had Detective Brockmeyer's handwriting on it, stated it was found near the alley, and there were no signs that the envelope was tampered

39

with. As previously stated, Detective Brockmeyer was deceased by the time of Defendant's trial, and therefore, he was not available to testify.

In November 1984, evidence could be deposited with the St. Charles City Police Department's evidence officer either by hand or via a secured locker system. Officers would use the locker system if they were depositing evidence after hours, by putting the evidence into a locker, obtaining a key for that specific locker, and putting the key into a one-way chute which only the evidence officer would have access. Evidence deposited in the locker system after hours would often be logged into evidence on the following day.

Officer Morie, the evidence officer, testified he received the stocking from Detective Brockmeyer on November 5, 1984, which was in its own sealed evidence envelope. Officer Morie logged the stocking into evidence, and it was maintained in a locked evidence area which only he had access until November 13, 1984, when Officer Morie took the stocking to the Southeast Missouri Regional Laboratory in Cape Girardeau ("the Missouri Regional Laboratory" or "the laboratory") for testing.

Dr. Robert Briner, who served as director of the Missouri Regional Laboratory in the 1980's, subsequently received the stocking at the laboratory. Dr. Briner testified he would have personally ensured the evidence envelope containing the stocking was sealed when he received it, would have opened up the envelope to test the evidence, and would have resealed the envelope when testing was finished. He also testified that the lab took precautions to prevent contamination, including wearing gloves and lab coats, and only working on one piece of evidence at a time. Dr. Briner testified that an item of evidence would not be tested unless it was sealed, and the only time evidence would be opened and unsealed in the laboratory was when it was examined.

Dr. Briner tested the stocking by, *inter alia*, taking small cuttings out of it and checking for the presence of stains and saliva; however, the tests did not link Defendant to the stocking.

40

After examining the stocking under different lighting at the Missouri Regional Laboratory, Dr. Briner had a theory that someone might have put the stocking over a shoe or boot, because the fibers on the stocking appeared to be deformed and there appeared to be an impression on the stocking. When Dr. Briner examined the stocking at trial, he testified there was no impression on the stocking. Dr. Briner stated that although his practice was to put his initials on items he tested, his initials were not on the stocking introduced into evidence at trial. However, Dr. Briner testified it was possible for him to have only initialed the evidence envelope containing the stocking. Additionally, Dr. Briner verified the stocking introduced into evidence at trial had cuttings taken out of it, which was consistent with his earlier testimony that cuttings were taken out of the stocking during testing. Dr. Briner testified he resealed the evidence envelope containing the stocking when he was finished testing it, and he would have used tape to seal the envelope, so the stocking would not get contaminated.

After Dr. Briner was done testing the stocking, Officer Morie picked it up from the Missouri Regional Laboratory on September 11, 1985. The evidence envelope containing the stocking was resealed and there were no signs of improper tampering. Officer Morie placed the evidence back into the secured evidence room at the police station.

Subsequently, in November 2010, Patricia Hallemeier, evidence and property custodian for the St. Charles City Police Department, checked out the evidence envelope containing the stocking to Detective Dave Weissenborn, who also worked for the police department. Hallemeier testified she considered an evidence envelope to be properly sealed when it is sealed with tape, would have inspected the envelope containing the stocking for proper sealing, and would have remedied any improper sealing before she would have given it to Detective Weissenborn. Detective Weissenborn testified the evidence envelope containing the stocking was sealed when he received it, he did not open it up, and he took the stocking to the St. Charles County Sheriff's Department for DNA testing.

41

In 2011, DNA testing was performed on the stocking by Fahnestock, who worked for the crime lab at the St. Charles County Sheriff's Department. The DNA testing on the stocking revealed the presence of a mixture of DNA consistent with Victim's and Defendant's DNA. The probability of someone besides Defendant in the general Caucasian population having the same DNA profile was 1 in 6.17 million.

Fahnestock stated that when he received the evidence envelope containing the stocking, the envelope was stapled and not taped. Nevertheless, Fahnestock testified that because of the placement on the staple holes on the evidence envelope, the flap on the envelope was folded over when it was stapled, which would make it very difficult for DNA to transfer into the envelope in the type quantities which would result in a false positive DNA test. Fahnestock also testified the DNA found on the stocking was not consistent with the quantity of DNA he would expect from any small amount of DNA "floating into that envelope." Finally, Fahnestock testified the evidence envelope, sealed with staples, was sealed sufficiently for him to perform DNA testing on the stocking, and if he felt like the evidence was improperly sealed in a way that would result in contamination, he would not have tested it.

### ii. Defendant's Arguments and Analysis

Defendant argues the State failed to provide a reasonable assurance that the stocking was the same item Officer Bextermueller observed at the crime scene because, (1) Officer Bextermueller did not affirmatively testify that the stocking offered into the evidence at trial was the same stocking he saw Detective Brockmeyer seize at Victim's home; (2) although Dr. Briner testified his practice was to put his initials on items he tested, his initials were not on the stocking introduced into evidence at trial; (3) although Dr. Briner testified he took small cuttings of the stocking, his notes did not mention that he took any cuttings; (4) when Dr. Briner examined the stocking under different lighting at the laboratory, the fibers on the stocking appeared to be deformed and there appeared to be an impression on the stocking, but when he examined the

stocking at trial there was no impression; and (5) the evidence envelope containing the stocking was stapled and not taped when Fahnestock received the stocking for DNA testing, and there was evidence that proper sealing was done with tape. While these factors could be considered alleged weaknesses in the chain of custody which could be a proper subject of cross-examination, any weakness in the chain of custody does not render the stocking inadmissible but instead is only a factual issue for the jury to consider in assessing the weight to be given to the stocking. *See Pennell*, 399 S.W.3d at 91; *Patterson*, 824 S.W.2d at 121; *Reed*, 811 S.W.2d at 55. Moreover, we find the detailed evidence set out in the previous subsection provided the trial court with a reasonable assurance that the stocking offered into evidence was the same stocking seized. In addition, Fahnestock's testimony in particular indicated that the fact the evidence envelope containing the stocking was stapled and not taped when he received it would not have contaminated the stocking or affected the reliability of the DNA testing on the item. Based on the foregoing, we hold the State established a sufficient chain of custody for the stocking, and the trial court did not abuse its discretion in admitting the stocking into evidence. Point four is denied.

3. **Admission of Exhibits and Testimony Pertaining to DNA Testing on the Cheese Wrapper**

In Defendant's fifth point on appeal, he maintains the trial court erred in admitting some of the exhibits and testimony from Fahnestock pertaining to DNA testing on the cheese wrapper, because the evidence concerned DNA data which was unreliable. We consider the merits of this claim because it involves a matter which may arise on retrial. *See O'Brien*, 857 S.W.2d at 221.

a. **Standard of Review**

It is within a trial court's broad discretion to admit or exclude evidence at trial, and an evidentiary ruling is reviewed for an abuse of discretion. *Hood*, 451 S.W.3d at 765. A trial court

abuses its discretion when its decision "is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id*.

### b. Evidence Adduced at Trial

Fahnestock, the DNA analyst and expert who performed DNA testing on the cheese wrapper, testified that the crime lab at the St. Charles County Sheriff's Department had established a detection threshold for DNA testing, and when DNA exceeded the threshold, an analyst could be assured the data was reliable. Fahnestock further testified he concluded that Defendant's brother Brian's DNA matched the DNA found on the cheese wrapper at five loci, and these loci were used to perform Fahnestock's statistical analysis. It's undisputed the DNA data relating to these five loci was above the detection threshold, was reliable, and was used for Fahnestock's conclusion that the probability of someone besides Brian in the general Caucasian population having the same DNA profile was 1 in 741,000.

Over Defendant's objection, the trial court allowed the admission of Exhibits 117-121, DNA data for five other loci which fell below the detection threshold, and the court allowed Fahnestock to testify about those exhibits. It is this evidence which is challenged in this point on appeal.

Fahnestock testified Exhibits 117-121 were "additional excerpts from electropherograms from the cheese wrapper and the known standard of Brian [ ]." Fahnestock further testified that because the excerpts were below the detection threshold, they were not used to calculate the statistical probability that the DNA profile found on the cheese wrapper would match anyone other than Brian in the general Caucasian population. The prosecutor then asked Fahnestock whether he believed the excerpts still had evidentiary value, and the following exchange occurred:

| Fahnestock: | Well, they may have value in that again, if we really feel that that's giving us evidence that this really is somebody else, then that would be very important evidence. In the absence of value, it really doesn't have evidentiary value. |
| --- | --- |
| Prosecutor: | But it does in terms of seeing if someone else is a contributor, right? |
| Fahnestock: | Correct. |

Fahnestock then testified about the specific alleles shown on Exhibits 117-121, stating they could only be used for exclusion. Fahnestock further testified that neither Defendant nor his brother Brian could be excluded as contributors based on the excerpts in the exhibits, and Fahnestock reaffirmed the alleles reflected in the exhibits were not used to perform his statistical analysis.

Defense counsel subsequently cross-examined Fahnestock about the loci which fell below the detection threshold, and Fahnestock reiterated that those loci could not be used to make a positive association. Defendant also called his own experts, Brian Krey and Daniel Krane, to testify regarding the importance of a detection threshold. Krey and Krane also testified that DNA data which falls below a detection threshold should not be used in a statistical analysis and cannot be reliably evaluated.

### c. Defendant's Argument and Analysis

In this case, Defendant asserts the trial court erred in admitting Exhibits 117-121 and Fahnestock's testimony about the exhibits, because the evidence concerned DNA data which was below the detection threshold and unreliable.

DNA evidence is scientifically acceptable and is therefore admissible as evidence in trial courts. *State v. Huchting*, 927 S.W.2d 411, 418 (Mo. App. E.D. 1996). Here, because Defendant's argument essentially concerns the specific results of the DNA testing conducted on the cheese wrapper, it goes more to the credibility of Fahnestock as a witness and the weight to be given to his testimony and the challenged exhibits rather than to the admissibility of the evidence. *See State v. Collings*, 450 S.W.3d 741, 762 (Mo. banc 2014) (similarly holding).

45

Accordingly, Defendant's remedy was not to be entitled to the exclusion of the challenged evidence but to have the opportunity to cross-examine Fahnestock and call expert witnesses of his own – an opportunity which Defendant had and exercised in this case. *See Ferguson*, 20 S.W.3d at 495 (similarly holding). Based on the foregoing, we hold the trial court did not abuse its discretion in admitting Exhibits 117-121 and Fahnestock's testimony about the exhibits. Point five is denied.

**4.** **Exclusion and Admission of Evidence Pertaining to Whether Victim's Granddaughter and Brian Were Still Dating at the Time of the 1980 Burglary**

Finally, Defendant's sixth and seventh points on appeal relate to the exclusion and admission of evidence pertaining to whether Victim's Granddaughter and Defendant's brother Brian were still dating at the time of the 1980 burglary of Victim's home. Defendant argues the evidence went to the issue of whether there was an innocent explanation for the police finding Brian's fingerprint on Victim's refrigerator door handle during their investigation of the 1980 burglary. Because of our holding in Section II.B.1. that the evidence relating to the 1980 burglary was inadmissible, Defendant's sixth and seventh points on appeal involve matters which are highly unlikely to arise on retrial. Accordingly, we do not consider the merits of these claims. *See O'Brien*, 857 S.W.2d at 221. Points six and seven are denied.

### III. CONCLUSION

The trial court's judgment is reversed and the cause is remanded for a new trial for second-degree felony murder and for further proceedings in accordance with our opinion.

_____
ROBERT M. CLAYTON III, Presiding Judge

Mary K. Hoff, J., and
Lisa P. Page, J., concur.

46